Filed 5/7/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL PEAU,<br><br>      Defendant and Appellant. | A138683<br><br>(Alameda County<br>Super. Ct. No. 168747) |

Defendant Michael Peau shot and killed Roberto Guzman outside the home where Guzman lived with Viridiana Vasquez and her family, including her father Gerardo.[1] The shooting occurred after Guzman and Gerardo told Peau, a long-time friend of the family, to stay away from the Vasquez home because he had sold Gerardo a stolen car. A jury convicted Peau of one count of first degree murder and found true the allegation that he personally and intentionally discharged a firearm causing death.[2]

On appeal, Peau claims that (1) the trial court erred by not sua sponte instructing the jury on voluntary manslaughter based on a sudden quarrel or heat of passion; (2) an evidentiary ruling involving Guzman's alleged gang affiliation improperly required Peau to choose between remaining silent and presenting a defense; and (3) the prosecutor committed misconduct in closing argument by referring to imperfect self-defense as a

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

[1] For clarity, we will refer to members of the Vasquez family by their first names. No disrespect is intended.

[2] The murder count was brought under Penal Code section 187, subdivision (a), and the firearm allegation was brought under Penal Code sections 12022.7, subdivision (a) and 12022.53, subdivision (d). All further statutory references are to the Penal Code.

"loophole" that would permit Peau to avoid responsibility. We reject these contentions and affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Guzman lived with the Vasquez family in a house in West Oakland. The Vasquez family included Gerardo, his wife, Adriana Lara, and his daughters, Viridiana and Jessica. Peau had known the Vasquez family for over a decade, frequently visited them, and was on friendly terms with Guzman.

In September 2011, Peau, who was then 22 years old, went to the Vasquez house with a friend and offered to sell a car to Gerardo for a low price. Gerardo testified that he "asked [Peau] if it was stolen, because [he] didn't want to have any problems." Peau assured him that the car belonged to a cousin who "was selling it cheap" because he no longer wanted it, and Gerardo purchased it for $100. When Gerardo attempted to register it the next day, he learned it had been stolen, and it was seized by the police. Peau testified at trial, and he denied that he sold the car to Gerardo or told him that it was not stolen.

When Peau next went by the Vasquez house, Guzman asked him why he had sold a stolen car to Gerardo. According to Gerardo, Peau became "upset" and briefly raised his shirt to show "two black guns" at his waist. Gerardo did not ask for the money to be returned and told Peau he had not given his name to the police, but he asked Peau to leave and said he "didn't want to see" him any more.

Jessica testified that she witnessed another confrontation between Peau and Guzman several days later. She was sitting outside the Vasquez house with Peau when Guzman leaned out a window and calmly told Peau to leave. Peau tried to explain that he had addressed the situation with Gerardo, but Guzman insisted he go. According to Jessica, Peau then told Guzman to come outside and showed him two guns that had been in the pocket of his hooded sweatshirt. Viridiana pulled Guzman back into the house, and Peau went to his car. Before driving away, Peau sent Jessica a text message claiming

2

he was going to "get" Guzman. Peau generally corroborated Jessica's version of this event, except he claimed that Guzman was very angry and that he only displayed a weapon after Guzman threatened to beat him up.

Gerardo testified that some days after he told Peau not to come back, he and Guzman were returning home and saw Peau's car, a distinctive blue Honda with a white bumper and fenders, parked outside the house. Gerardo approached Peau and told him that he "didn't want to see [Peau] there any[]more . . . and . . . didn't want to have any problems." Peau "said it was fine" and left. Gerardo, who went on a trip later that night, "had a feeling that something was going to happen because [Peau] had weapons."

On September 24, while Gerardo was still away on his trip, Guzman was changing the oil in his car, which was parked in front of the Vasquez house. Guzman went inside, asked Lara for an empty milk jug so he could use it to recycle the used oil, and returned to his car. A couple minutes later, Lara heard gunshots outside. She looked out the window and saw Guzman take a few steps and then begin to fall. She saw Peau driving away in the blue Honda. Jessica similarly testified that she heard gunshots, went to the window, saw Guzman still standing up, and watched Peau's Honda drive down the street.

A neighbor who was outside at the time saw a man she later identified as Peau drive by three times in a blue car with a white front. The third time, the car stopped, and Peau, who remained inside, began talking to Guzman. They did not appear to be arguing. The neighbor went inside to get something and heard a shot. She ran to close her door and saw Guzman on the ground, with Peau "stand[ing] over his buddy and just pow, pow, pow, pow, pow."

Peau gave a different account of the shooting. He testified that he was a drug dealer and carried a gun for protection, and he was near the Vasquez house that day to sell drugs. As Peau drove by the house, Guzman "motioned for [him] to stop," and Peau, thinking Guzman might have calmed down about the stolen-car incident, told him he would be right back. Peau soon returned, parked by the house, and got out of his car. Guzman seemed normal, but when Peau approached him, Guzman said, "I thought I told you not to come around here."

3

Peau recalled being surprised at Guzman's statement because Guzman had flagged him down, and he testified that as he was processing the situation, Guzman "swung [a] screwdriver" toward his head. Peau drew his gun and intentionally began firing. He remembered shooting toward the ground four times, "and then . . . everything froze," and he was getting into his car and leaving. Peau was "panicked" and "scared," could not "think clearly," and could not "explain anything after the fourth shot." He claimed that Guzman was still standing when he drove away, and he denied ever standing over Guzman and shooting him as he was on the ground.

The police soon recovered the blue Honda, which was registered to Peau's girlfriend and was parked a few blocks away from the Vasquez home. According to his girlfriend, Peau called her on the afternoon of the murder and told her to report the car stolen but would not tell her why he was making the request. Peau admitted asking her to "falsely report the car was stolen" because he "was panicked."

Guzman had been shot ten times in his torso and legs. The forensic pathologist who performed the autopsy testified that, based on the angles at which the bullets entered Guzman's body, Guzman could have been shot while lying down but the possibility he was hit by "bullets ricochet[ing] upwards toward [his] body" could not be excluded. Eleven casings were collected at the scene. There were also four strike marks on the pavement caused by bullets hitting the ground, which could have resulted either from someone shooting at the ground or from bullets exiting Guzman's body. A screwdriver was found lying near the body.

A few days after the murder, a police officer saw Peau exit a residence in another area of Oakland, and he was arrested. An unloaded black Glock .9 millimeter semi-automatic pistol with the serial number removed and several items with Peau's name on them were found in a backpack in that residence. A criminalist testified that the 11 casings recovered at the scene had all been shot with this weapon.

The jury found Peau guilty of first degree murder and found true the allegation that he personally and intentionally discharged a firearm causing death. The trial court

4

sentenced him to 50 years to life in prison, comprised of a term of 25 years to life for the murder and 25 years to life for the firearm allegation.

II.

DISCUSSION

A.      *Any Error in the Trial Court's Failure to Instruct the Jury on Voluntary Manslaughter Based on a Sudden Quarrel or Heat of Passion Was Harmless.*

Peau contends that his conviction must be reversed because the trial court did not give an instruction that he was guilty of voluntary manslaughter if he acted based on a sudden quarrel or heat of passion (a heat-of-passion instruction). His claim lacks merit. Any error in this regard was harmless because the jury necessarily rejected the possibility that Peau acted in the heat of passion by convicting him of first degree murder.

The jury was instructed under CALCRIM No. 505 that Peau was not guilty of murder or manslaughter if he acted reasonably in self-defense and under CALCRIM No. 571 that he was guilty of the lesser included offense of voluntary manslaughter if he acted unreasonably in self-defense. It was also instructed under CALCRIM No. 522 that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter" and "[t]he weight and significance of the provocation, if any, [was] for [it] to decide." Finally, it was instructed under CALCRIM No. 521 that Peau was guilty of first degree murder as opposed to second degree if "he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." (Italics omitted.) No heat-of-passion instruction was either requested or given, and the jury did not ask for clarification of any of the instructions it received.

After the verdict, Peau moved for a new trial based in part on the failure to give a heat-of-passion instruction. In denying the motion, the trial court indicated that it "did not give a heat[-]of[-]passion instruction because it was [its] belief that there was no evidence worthy of credence that there was a sufficient provocation on the part of the

5

victim such as would [have prompted] an average person in the same situation to . . . react[] from passion, rather than judgment. [¶] Further, . . . if there was error in not giving that instruction, it was harmless error because [the court] did give CALCRIM [No.] 522, which informed the jury that [it] could take provocation . . . into consideration in reducing the crime from first degree to second degree or to manslaughter. And the jury rejected second degree murder and manslaughter, so [it] must necessarily have rejected . . . any finding that the victim of the offense offered provocation." In our view, any error in failing to give a heat-of-passion instruction was harmless because the jury necessarily found that the murder was willful, deliberate, and premeditated when it convicted Peau of first degree murder.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) When a person kills while acting "upon a sudden quarrel or heat of passion"—even if exercising a sufficient "measure of thought . . . to form . . . an intent to kill"—he or she acts with "a mental state that precludes the formation of malice." (§ 192, subd. (a); *People v. Beltran* (2013) 56 Cal.4th 935, 942.) Thus, the offense of murder is reduced to the lesser included offense of voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion. (*Beltran*, at p. 942.) A person acts upon a sudden quarrel or in the heat of passion if he or she "acts without reflection in response to adequate provocation." (*Ibid.*) Provocation is legally adequate if it " ' "would cause the ordinarily reasonable person of average disposition to act rashly and . . . from . . . passion rather than from judgment." ' " (*Ibid.*)

A trial court has the duty "to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) "[I]n a murder prosecution," a court's sua sponte duty "includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*Id.* at p. 149.) Here, however, we need not determine whether the trial court's sua sponte duty was triggered because we conclude that any error in failing to give a heat-of-passion instruction was harmless.

6

Peau argues that the federal constitutional standard for assessing prejudice, which requires reversal unless it appears beyond a reasonable doubt that an error did not contribute to the verdict, applies to this claim. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The Attorney General counters that the applicable standard is the state constitutional standard, which requires reversal only if there is a reasonable probability that the error contributed to the verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Peau relies on *People v. Thomas* (2013) 218 Cal.App.4th 630, which held that the *Chapman* standard applied to a defendant's claim that the trial court erred by not giving a *requested* heat-of-passion instruction. (*Thomas*, at pp. 633, 643-644.) As explained in *People v. Millbrook* (2014) 222 Cal.App.4th 1122, however, *Thomas* does not necessarily resolve whether an error in failing to give such an instruction sua sponte is also one of federal constitutional dimension. (*Millbrook*, at pp. 1145-1146.) For our purposes, it is not necessary to decide which standard of prejudice applies because any error was harmless even under the more stringent *Chapman* standard. (See *Millbrook*, at p. 1146.)

The Attorney General argues that Peau's conviction of first degree murder renders any failure to give a heat-of-passion instruction harmless because the jury necessarily found that the murder was willful, deliberate, and premeditated. We agree. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) *People v. Wharton* (1991) 53 Cal.3d 522, the primary case on which the Attorney General relies, applied this principle to hold that, where "comprehensive instructions on provocation and heat of passion" were otherwise given, an error in refusing to give an instruction "that legally adequate provocation could occur over a considerable period of time" was harmless because the defendant was found guilty of first degree murder. (*Id.* at pp. 571-572.) *Wharton* determined that by returning that verdict, "the jury necessarily found [the] defendant premeditated and deliberated the killing," a "state of mind, involving planning and deliberate action [that] is manifestly inconsistent with having acted under the heat of passion." (*Id.* at p. 572.) The verdict

7

therefore "clearly demonstrate[d] that [the] defendant was not prejudiced by the failure to give his requested instruction." (*Ibid.*)

Peau counters that the Attorney General's argument was rejected in *People v. Berry* (1976) 18 Cal.3d 509. *Berry* held that the failure to give a requested heat-of-passion instruction was not rendered harmless just because the defendant was convicted of first degree murder, explaining, "While the instructions made passing reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees, such reference was casually made[,] [and] [t]here was no clear direction to the jury to consider the evidence of [the victim]'s course of provocatory conduct so as to determine whether [the] defendant, as an ordinary man of average disposition [citation] having been exposed to such conduct, was provoked into committing the homicide under a heat of passion." (*Id.* at pp. 512, 518; see also *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1487-1488 [argument that conviction of first degree murder rendered the failure to give heat-of-passion instruction harmless "fail[ed] as a matter of law" under *Berry*].)

While we acknowledge that there is some tension between the holdings in *People v. Berry, supra*, 18 Cal.3d 509 and *People v. Wharton*, *supra*, 53 Cal.3d 522, we believe they can be reconciled and that *Wharton*'s more recent reasoning is directly on point in this case. The jury here was instructed that it could not return a verdict of first degree murder unless it found that Peau "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." We agree that such a finding "is manifestly inconsistent with having acted under the heat of passion." (*Wharton*, at p. 572.) Although *Berry* refused to find an error in omitting a heat-of-passion instruction harmless, it did not even mention that first degree murder must be willful, deliberate, and premeditated. Instead, it focused only on the fact that the instruction distinguishing between first and second degree murder in that case "made passing reference to heat of passion and provocation for the purpose of distinguishing between" the two types of murder. (*Berry*, at p. 518.) We think this strongly suggests that the sole issue considered in *Berry* was whether the error was harmless because the

jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a finding was inconsistent with a finding that the defendant acted in a heat of passion. As a result, we disagree with the conclusion reached in *People v. Ramirez*, *supra*, 189 Cal.App.4th 1483 that *Berry* forecloses a determination that such an error is harmless for the latter reason. (*Ramirez*, at pp. 1487-1488; see *People v. Brown* (2012) 54 Cal.4th 314, 330 ["cases are not authority for propositions not considered"].) We conclude that the failure to give a heat-of-passion instruction here was harmless beyond a reasonable doubt because the jury found that Guzman's murder was willful, deliberate, and premeditated.

B.     *Peau Forfeited His Challenge to the Ruling Requiring Him to
       Provide a Foundation for Evidence of Guzman's Gang Affiliation.*

Peau claims the trial court erred by requiring him to testify that he believed Guzman was affiliated with a gang before it would permit Viridiana to be questioned about any such affiliation. He argues that the ruling improperly forced him to choose between exercising his constitutional right not to testify and his constitutional right to present a defense. We conclude that Peau forfeited this claim.

Before trial, the prosecution moved to exclude any evidence "that Guzman had some affiliation with a criminal street gang" because his "purported gang ties had nothing to do with the shooting." At the hearing on the motion, Peau's trial counsel objected, stating, "Every homicide gets down to a state of mind issue, and at issue is my client's state of mind, and the fact that or the possible fact that [Guzman] was affiliated with [a gang]. According to his family he was, and according to police officers he was, and . . . therefore, my client would have had knowledge of [Guzman]'s affiliation with [this] known violent street gang[, which] tends to be probative of my client's state of mind of having reason to fear this individual, if this individual attacks him."

The trial court responded that it believed "a precondition for the relevance of the evidence would be that [Peau] [k]new of . . . Guzman's affiliation." Peau's trial counsel then asked whether he could question Viridiana about the affiliation before the

9

precondition was established, or whether he would need to recall her during the defense case. After hearing argument from both sides, the court ruled, "[I]t would be premature to bring up [during cross-examination] any knowledge that she might have of affiliation with the [gang], but if and when [Peau] states that [the affiliation] was a factor in his mind, then [the defense may] recall her as [its] witness." Peau's counsel responded, "So I can either subpoena her while she's here, or just have her subject to recall . . . . [¶] . . . [¶] . . . I understand the Court's ruling and I'll do my best to abide by that."

At trial, Peau testified that Guzman had been a gang member in Fairfield but that Peau was "not sure" whether he was affiliated with a gang after moving to Oakland. Peau never testified that Guzman's possible gang affiliation played a role in the shooting, and Viridiana, who testified for the prosecution, was never recalled during the defense case.

Peau's claim is premised on *Brooks v. Tennessee* (1972) 406 U.S. 605, in which the United States Supreme Court held that a Tennessee statute requiring a defendant " 'desiring to testify [to] do so before any other testimony for the defense is heard by the court trying the case' " was an unconstitutional "restriction on the defendant's right against self-incrimination." (*Id.* at pp. 606, 609.) The high court explained that until other defense evidence is presented, a defendant will not necessarily know "whether his own testimony will be necessary or even helpful to his cause" and "might prefer to remain silent at that point, putting off his testimony until its value can be realistically assessed." (*Id.* at p. 610.) The Tennessee law "exact[ed] a price for [a defendant's] silence by keeping him off the stand entirely unless he cho[s]e to testify first," and this, said the court, unduly constrained the right to remain silent. (*Id.* at pp. 610-611.) In addition, the court concluded that the law also violated a defendant's due process rights because it constituted a "depriv[ation] of the 'guiding hand of counsel' " in determining whether and when to testify. (*Id.* at pp. 612-613.)

The Attorney General argues that Peau forfeited his claim by failing to object on constitutional grounds below. *People v. Tafoya* (2007) 42 Cal.4th 147 considered a similar claim involving a trial court's "ruling [that] preclud[ed] cross-examination of [the

victim's associate] regarding [the associate's] reputation for dangerousness"—which the defendant wished to undertake to support his self-defense claim—until a foundation had been laid that the defendant knew of that reputation. (*Id.* at pp. 164-166.) *Tafoya* determined that the defendant had forfeited his claim that the ruling violated his right to remain silent by not objecting on that ground below. (*Id.* at p. 166.) Likewise, we conclude that Peau forfeited his Fifth Amendment claim by failing to object to the trial court's ruling on that basis.

*People v. Tafoya*, *supra*, 42 Cal.4th 147 did, however, determine that the defendant's claim that the ruling "violat[ed] his [constitutional] rights to due process and to a fair trial" was not forfeited and analyzed that claim by considering whether the trial court abused its discretion in "ruling on the sufficiency of the foundational evidence." (*Id.* at p. 165.) In doing so, *Tafoya* explained that the due process claim did " 'not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert[ed] that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, [the] defendant's new constitutional arguments [were] not forfeited on appeal.' " (*Id.* at p. 165, fn. 5, italics omitted.) In his reply brief, Peau argues that his claim is of the same type because he "contends that the legal consequence of the trial court's ruling requiring him to take the stand and testify to his knowledge of Guzman's [gang] affiliation was not only wrong; it also had the additional legal consequence of violating" his constitutional rights. (Italics omitted.)

Even accepting that Peau could have otherwise preserved the due process aspect of his claim without objecting on that ground below, he never actually argues that the ruling was erroneous as a matter of state evidentiary law or for any other non-constitutional reason. Moreover, he never objected to the ruling on *any* basis. He claims his objection to the People's motion to exclude evidence of Guzman's gang affiliation was sufficient, but he prevailed on that issue: the trial court denied the motion, indicating it would permit such evidence to be introduced as long as Peau laid a foundation for it first, and

his trial counsel acquiesced to that procedure.  We therefore conclude the claim was forfeited.

> ### C.     *Peau Is Not Entitled to Relief on His Claim of Prosecutorial Misconduct.*

Finally, Peau argues that his due process rights were violated when the prosecutor characterized imperfect self-defense as a "loophole" that would permit Peau to avoid responsibility for the murder.  While we agree with Peau that the comments were improper, we are not persuaded that he properly preserved the issue or that the comments were prejudicial.

During closing argument, the prosecutor addressed imperfect self-defense as follows:  "Now the elements are that the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and that he actually believed that the immediate[] use of deadly force was necessary to defend against that danger, but at least one of those beliefs was unreasonable.  Basically, this is what I consider a loophole."  After arguing that the evidence established Peau did not actually believe Guzman posed a threat after the fourth shot was fired, the prosecutor concluded, "So you see, self-defense doesn't apply.  Imperfect self-defense doesn't apply.  The defendant is not walking out of these doors using this excuse, and the defendant is not getting anything less than murder, based on the lies that he's told."  Peau did not object to these statements when they were made.

A prosecutor's improper comments violate the federal Constitution if they " ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.)  Absent a federal constitutional violation, a prosecutor's conduct violates " ' "state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citations.]' " (*Ibid.*)  In determining whether a prosecutor's statements before the jury constitute misconduct, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Id.* at p. 1001.)

A claim of prosecutorial misconduct involving comments before the jury is generally forfeited unless the defendant both timely objects and " ' " 'request[s] that the jury be admonished to disregard the impropriety.' " ' " (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Peau acknowledges his failure to object to the prosecutor's discussion of imperfect self-defense, but he argues he meets the exception allowing review where " ' "an admonition would not have cured the harm caused by the misconduct." ' " (*Id.* at pp. 1000-1001.)

Initially, we agree with Peau that the prosecutor's statements were improper. A "loophole" is defined as "[a]n ambiguity, omission, or exception (as in a law or other legal document) that provides a way to avoid a rule without violating its literal requirements." (Black's Law Dict. (8th ed. 2004) p. 962, col. 1.) The prosecutor's use of that term to describe imperfect self-defense suggested that the doctrine provides an illegitimate "out" for a defendant who should otherwise be convicted of murder. In fact, the doctrine, a " 'judicially developed theory' " that has been the subject of much discussion in the case law, is hardly the result of an oversight. (*People v. Wright* (2005) 35 Cal.4th 964, 979-983 (conc. opn. of Brown, J.) quoting *People v. Rios* (2000) 23 Cal.4th 450, 465.) Nor does it allow a defendant to "get away with murder": instead, it recognizes that a defendant who killed "because [he] actually but unreasonably believed he was in imminent danger of death or great bodily injury . . . [has] acted without malice" and therefore has not committed murder at all. (*In re Christian S.* (1994) 7 Cal.4th 768, 771, italics omitted.) As a result, the use of the word "loophole" was inaccurate and improper to the extent it might have dissuaded the jury from finding that Peau acted in imperfect self-defense. (See *People v. Najera* (2006) 138 Cal.App.4th 212, 220-221 [prosecutor's comment in closing "referring to voluntary manslaughter as a legal fiction misleadingly suggested it is not a real crime"].) In addition, the prosecutor's implication that Peau would be freed if the jury found he acted in imperfect self-defense was clearly improper. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 704 [misconduct for prosecutor to "suggest[] that when an accused is found insane he is let free"].)

Peau fails to convince us, however, that an admonition from the trial court could not have cured any harm from the prosecutor's statements. He seeks to distinguish *People v. Najera*, *supra*, 138 Cal.App.4th 212, which, while determining that the characterization of voluntary manslaughter as a "legal fiction" was misconduct, nevertheless held that the defendant forfeited the claim by failing to object below because "[t]he trial court immediately could have corrected misleading or inaccurate statements of the law and could have warned the prosecutor not to repeat them." (*Id.* at pp. 220-221, 224.) Peau argues that "the [*Najera* trial] court could easily have corrected [the prosecutor's] statement by informing the jury that voluntary manslaughter is in fact 'a real crime' " and referring back to the instruction on that crime's elements. He claims the prosecutor's "loophole" comment here could not be similarly cured because it conveyed to the jury that it could "accept the [trial] court's legal instructions" but still give effect to the law's intent instead of its letter.

We disagree. Even assuming that an instruction to follow the trial court's interpretation of the law instead of counsel's, standing alone, would not have cured the problem, the trial court could have further instructed that the doctrine of imperfect self-defense is not a "loophole" but rather recognizes that a defendant with an actual belief in the need for self-defense cannot form the requisite mind state to commit murder. The court could have also emphasized that if the jury found Peau acted in imperfect self-defense, it would have to convict him of voluntary manslaughter and could not simply acquit him. Because the harm from the improper statements could have been cured by appropriate admonitions, Peau waived this claim by failing to object below.

Finally, even if Peau had preserved this claim, we would reject it because the statements were harmless. First, although the prosecutor should not have referred to imperfect self-defense as a "loophole," he acknowledged the doctrine's existence and argued against its applicability. As a result, his remarks did not convey to the jury that it should simply disregard the doctrine. Second, the jury was instructed to find Peau guilty of voluntary manslaughter if it concluded he acted in imperfect self-defense, and it is unlikely that any jury member would have believed a conviction of this crime would

14

result in Peau's freedom.  Finally, the jury was instructed that it had to follow the law as explained by the trial court, not counsel, and that closing arguments are not evidence, further addressing the problems with the prosecutor's statements.  (See *People v. Cunningham*, *supra*, 25 Cal.4th at pp. 1001-1002.)  Therefore, there was not " 'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Id.* at p. 1001.)

### III.
#### DISPOSITION

The judgment is affirmed.

_____
Humes, P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

*People v. Peau* (A138683)

16

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Allan D. Hymer |
| Counsel for Appellant: | Lawrence A. Gibbs, under appointment by the First District Appellate Project |
| Counsel for Respondent: | Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Joan Killeen, Deputy Attorney General |