Filed 7/27/21  P. v. Franklin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER M. FRANKLIN,<br><br>    Defendant and Appellant. | C089644<br><br>(Super. Ct. No. 15F06717) |

A jury found defendant Christopher M. Franklin guilty of the first degree murder of Anna, the attempted murder of Dennis, an assault on Douglas by means of force likely to produce great bodily injury, and three counts of carrying a concealed firearm on his person during the commission of each of these offenses.  (*People v. Franklin* (Sept. 6, 2018, C083294) [nonpub. opn.].)  Defendant previously appealed, challenging the sufficiency of the evidence on some counts and claiming instructional error with respect to others.  (*Ibid.*)  We reversed the first degree murder and attempted murder convictions, and associated convictions for carrying a concealed firearm.  (*Ibid.*)

1

On retrial, a jury again found defendant guilty of the first degree murder of Anna (count one), the attempted murder of Dennis (count two), and carrying a concealed firearm on his person in the commission of the last offense (count three). The jury also found true gun enhancements on counts one and two. The trial court sentenced defendant to a total determinate term of 10 years eight months, plus an indeterminate term of 75 years to life. The trial court also ordered defendant to pay various fines and fees.

Defendant appeals, arguing: (1) the trial court prejudicially erred by failing to instruct, sua sponte, on voluntary manslaughter as a lesser included offense to murder; (2) the trial court abused its discretion in failing to consider his service-related posttraumatic stress disorder (PTSD) as a mitigating factor at sentencing under Penal Code section 1170.91;[1] (3) the trial court erroneously calculated the court operations assessment (§ 1465.8) and court facilities fee (Gov. Code, § 70737); and (4) the abstract of judgment bears the wrong conviction date for two offenses that were adjudicated in the first trial, but were neither reversed nor retried. We reject defendant's first contention and accept his second. We will remand for resentencing to allow the trial court to fulfill its statutory duty under section 1170.91. Because we are remanding, we need not reach defendant's remaining contentions.

## I.  BACKGROUND

*A.      Attempted Murder of Dennis*

Dennis was homeless. On July 10, 2015, he went to sleep around 9:00 p.m. inside a dimly lit tunnel underneath some railroad tracks in Sacramento County. He awoke to someone standing at the opening of the tunnel about 10 feet away. Dennis could not tell whether the person was a man or a woman, but he could see that the person was about six

---

[1] Undesignated statutory references are to the Penal Code.

2

feet tall with an athletic build. Dennis rolled over. He asked, "What do you want?" The person shot Dennis several times and then took off.

B.      *Murder of Anna*

Anna was also homeless. In October 2015, she lived in a tent near some railroad tracks in Sacramento. Anna's brother, Lance, lived nearby, in a campsite he shared with his girlfriend and another sister, Chris. On October 11, 2015, Anna brought dinner for the group and left the campsite sometime later. Sometime after nightfall, Lance heard an argument between a man and a woman that seemed to come from a nearby house. The argument went on for a couple of minutes. Lance did not pay close attention, as he was dozing off to sleep. Nevertheless, he thought the man and woman were a couple. Lance did not recognize either of their voices. Lance then heard a gunshot, followed by a voice saying, "oh my God." He then heard two more shots, followed by silence. He then went to sleep. It was not unusual to hear arguing, gunshots, or fireworks near the railroad tracks.

Chris was sleeping in a tent near Lance and his girlfriend. She was awakened by a helicopter passing around 9:00 p.m. or 9:30 p.m. Shortly thereafter, she heard a shot, followed by a woman saying, "oh, my God. What are you doing?" She then heard two more shots. She did not recognize the woman's voice as that of her sister. The next morning Chris went to Anna's camp and found her on the ground, dead. Anna had been shot multiple times. Law enforcement found two spent .40 caliber shell casings near her body.

C.      *Assault on Douglas*

Douglas worked for Sacramento County as a field surveyor. He was wearing an orange reflective vest and working near some railroad tracks on the morning of October 13, 2015. Defendant approached Douglas and asked for some water. Douglas responded that there was plenty of ice-cold water in his truck, but his partner had taken the truck to

3

another location. Douglas told defendant he could have some water as soon as his partner returned with the truck. Douglas then went back to his work.

Douglas entered a nearby telephone yard and saw two men working there. He approached the telephone workers to introduce himself. Before Douglas could say anything, defendant came up from behind and put him in a choke hold. Douglas began to lose consciousness. One of the telephone workers, Jason, saw defendant with his arm around Douglas's neck. Jason yelled, "Stop. Get out of here." Defendant let go of Douglas, who fell to the ground. Defendant said, "[S]orry. I thought you were somebody else." He then walked away, muttering something about Douglas being on someone else's property.

Jason called 911 and followed defendant in his truck. Douglas's partner returned with their truck, and Douglas followed defendant as well. Police arrived, and Douglas pointed defendant out. Defendant was detained and searched. The search uncovered a black .40 caliber semiautomatic pistol with a live round in the chamber.

D.     *Investigation*

Police interviewed defendant. He denied assaulting Douglas or having a gun. He said that he ran almost every day, usually around 6:00 p.m. He sometimes ran on a greenbelt near the railroad tracks, but he denied running on October 11, 2015, the day Anna was killed.

Police searched defendant's home, which was approximately 500 yards from the spot where Anna was murdered and 600 yards from the spot where Dennis was shot. They found an empty handgun case with the same serial number as the gun found in defendant's possession. A records check with the California Department of Justice established that the gun was not registered to anyone. A firearms trace through the federal Bureau of Alcohol, Tobacco, and Firearms disclosed that the gun had been sold to a man in Olympia, Washington. Ballistics tests showed that the casings recovered from the crime scenes had been fired from the same gun.

4

E.	*First Trial*

Defendant was arrested, tried by jury, and convicted of first-degree murder, attempted murder, assault by means of force likely to produce great bodily injury, and three counts of carrying a concealed firearm. (*People v. Franklin*, *supra,* C083294.) The jury also found true that defendant personally and intentionally discharged a firearm and proximately caused great bodily injury or death in the commission of the murder and attempted murder. (*Ibid.*) We reversed the murder and attempted murder convictions, and associated convictions for carrying a concealed firearm, giving the prosecution the option to retry defendant on the same counts. (*Ibid*.)

F.	*Second Trial*

Defendant was tried a second time over the course of four days in April 2019. The prosecution's witnesses testified substantially as described *ante*. The prosecution also presented the testimony of defendant's sister. She explained that she lived with defendant and their mother at the time of the above-described events. She recalled that she had seen defendant asleep on the sofa in August 2015 with what appeared to be a black handle sticking out of the blanket that covered him. She thought the object might have been the handle of a gun. She also recalled that defendant had been angry and aggressive on the evening of October 11, 2015, prompting her to lock herself in her room between 7:00 p.m. and 8:00 p.m. She did not see defendant again for the rest of the night.

The prosecution also read defendant's testimony from the first trial aloud for the jury. That testimony is summarized below.

Defendant denied shooting Dennis. He denied knowing Dennis, denied having a gun on July 10, 2015, and denied being near the railroad tracks on the day Dennis was shot. He acknowledged, however, that the crime scene was near his home, and he used to skateboard there as a teenager.

5

Defendant also denied shooting Anna. He denied knowing Anna and maintained that he had no dealings with her, and no reason to want to do her harm. Defendant also denied having a gun on October 11, 2015. He acknowledged, however, that the murder scene was near his home, adding that he knew the area well from running every evening. Defendant said that he might have gone for a run on the evening of October 11, but he insisted that he did not go near the railroad tracks that night.

Defendant testified to a strange encounter sometime between 10:00 p.m. on October 12, 2015, and 3:00 a.m. the next morning. He was home, asleep on the sofa, when he was awakened by the sound of the side gate rattling. He went outside and saw a man with a bicycle and trailer digging through his garbage cans. The man appeared to be homeless and seemed to be "strung out pretty bad."

Defendant explained that there were frequent problems with robberies in the area, and he was concerned the man may have been "casing" his house. Defendant began going through the man's things. He saw a case that looked like something that belonged to his sister. The case contained a gun. Defendant asked the man where he got the gun. The man said he found it. Defendant took the gun inside to get his phone to call the police. When he returned, the man was gone. Defendant tried to call the police, but his phone was not working. He hid the gun in the garage and went back to sleep.

Defendant testified that he was awakened the next morning by more noises by the side gate. He went outside and found a man wearing a reflective vest. The man ran off. Later that morning, defendant set out walking, looking for the man. He took the gun with him because he did not want to leave it at home. He saw Douglas, who was wearing a reflective vest and resembled the man he had seen earlier. Defendant acknowledged grabbing Douglas, but claimed he did not choke him. He explained, "There's a bunch of weird stuff going on, had been going on. I was stressed out, I was tired, it was hot, and I just made a bad decision, so I just let him go."

6

Defendant acknowledged that he had previously lived in Olympia, Washington, and had also been stationed in nearby Fort Lewis while in the military. However, defendant denied knowing the man who purchased the gun in Olympia. Defendant also denied having a gun in August 2015, theorizing that his sister might have seen him sleeping with a BB gun.

Defendant testified that he does not mind homeless people, but does not like "people coming and breaking into my house or breaking into my neighbors' houses or screaming at 2:00 o'clock in the morning at the top of their lungs threatening to kill imaginary people." "It gets pretty annoying," defendant said, "it's scary, and it's annoying." Defendant similarly testified that he was "indifferent" to the encampments of homeless people near the railroad tracks, but "the . . . thing that kind of spooked me out was the fact that there—it looked like there was always a bunch of—it just looked like people were going up and down the whole area just robbing houses. [¶] If you looked left and right, you'd see the train tracks, just rob houses, and I would just see tarps full of stolen things and broken things, you know, dead animals, all sorts of things."

G.     *Verdict, Judgment, and Sentence*

The jury returned verdicts after less than a full day of deliberations. The jury found defendant guilty of the first degree murder of Anna (count one), the attempted murder of Dennis (count two), and carrying a concealed firearm on his person in the commission of the last offense (count three). The jury also found true gun enhancements on counts one and two.

Defendant appeared for judgment and sentencing on May 20, 2019. Before the sentencing hearing, defense counsel moved to rerefer the matter to probation for consideration of defendant's military service. Defense counsel noted that neither the original probation report nor a resentencing memorandum prepared by the probation department made any mention of defendant's military service, which included combat duty in Iraq. The trial court agreed to continue the sentencing hearing to June 4, 2019, so

7

that an updated probation report could be prepared. Defendant objected, maintaining that his military service was irrelevant and adding that he would rather go to prison than remain in county jail. The trial court granted defense counsel's motion and continued sentencing over defendant's objection.

Defendant returned for judgment and sentencing on June 4, 2019. The trial court explained on the record that probation officers had requested defendant's service records, but those records would not be delivered for several weeks, assuming the request were even granted. The trial court then indicated its understanding, which defendant confirmed, that defendant was not willing to waive time. The trial court denied defense counsel's request to waive time over defendant's objection, stating: "Mr. Franklin has made it abundantly clear, and in the [c]ourt's estimation, it is a knowing and voluntary request that he be sentenced today, and the [c]ourt is going to honor Mr. Franklin's request. He has insisted on being sentenced today."

The trial court then heard argument. Defense counsel renewed his request to continue the matter in hopes of receiving a supplemental probation report with additional information concerning defendant's military service. The prosecutor acknowledged that defendant had served in the U.S. Army, stationed in Washington state. However, the prosecutor argued that "even if [defendant] were a war hero, which we do not know, it does not negate or mitigate the evil fashion in which the defendant hunted out vulnerable, sleeping, homeless people and shot them for no reason other than his own desire to hurt them." The trial court agreed with the prosecutor, stating: "[T]he defendant's military service does not mitigate the gravity or seriousness of the crimes committed or the harm inflicted on the victims or the victims' family." The trial court continued: "So while I appreciate and respect Mr. Franklin's [m]ilitary service; nonetheless, the [c]ourt does not find that his [m]ilitary service is a circumstance in mitigation."

The trial court then sentenced defendant to a total determinate term of 10 years eight months, plus an indeterminate term of 75 years to life. The sentence included an

indeterminate term of 25 years to life for the first degree murder of Anna (count one), plus an additional indeterminate term of 25 years to life for the gun enhancement (§ 12022.53, subd. (d)).  The trial court declined to exercise its discretion to strike the enhancement (§ 12022.53, subd. (h)), stating, "[T]his was a brutal crime for which the defendant has not expressed any remorse."

The trial court sentenced defendant to an upper term of nine years for the attempted murder of Dennis (count two), plus an additional 25 years to life for the gun enhancement.  As before, the trial court declined to exercise its discretion to strike the gun enhancement (§ 1385) or impose a lesser enhancement (§ 12022.53, subds. (b) or (c)), stating, "Once again, this was a brutal crime in which the defendant shot [Dennis] while he was sleeping and defenseless."  The trial court imposed a consecutive eight month-term (one third the middle term) for carrying a concealed weapon in the commission of the attempted murder.

The trial court imposed a sentence of one year (one third the middle term) for the assault on Douglas by means of force likely to produce great bodily injury and eight months (one third the middle term) for the associated count of carrying a concealed weapon, both consecutive to the sentence on count two.  The trial court also imposed a three year sentence on count three, which it stayed pursuant to section 654.

The trial court also ordered defendant to pay various fines and fees, including a court operations assessment of $240 (§ 1465.8) and a court facilities fee of $180 (Gov. Code, § 70737).

This appeal timely followed.

## II.  DISCUSSION

### A.    *Instructional Error*

Defendant argues the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter as a lesser included offense of murder.  Specifically, he argues the trial court should have instructed the jury on the theories of imperfect self-defense

9

(CALCRIM No. 571) and heat of passion (CALCRIM No. 570).  We conclude the trial court had no duty to instruct on either theory as there was no evidence from which a reasonable jury could have concluded that defendant actually acted in the belief that he was in imminent danger or in the heat of passion.

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence," which, in a murder prosecution, includes "the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied."  (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.)  "[T]he existence of '*any* evidence, no matter how weak, will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed."  (*Id.* at p. 162.)  We review de novo a trial court's decision not to give a particular instruction.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.)

1.      *Heat of Passion*

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).)  When a person kills while acting 'upon a sudden quarrel or heat of passion' [citation] even if exercising a sufficient 'measure of thought . . . to form . . . an intent to kill'—he or she acts with 'a mental state that precludes the formation of malice.' [citations].  Thus, the offense of murder is reduced to the lesser included offense of voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion.  [Citation.]  A person acts upon a sudden quarrel or in the heat of passion if he or she 'acts without reflection in response to adequate provocation.'  [Citation.] Provocation is legally adequate if it ' " 'would cause the ordinarily reasonable person of

10

average disposition to act rashly and . . . from . . . passion rather than from judgment.' " ' " (*People v. Peau* (2015) 236 Cal.App.4th 823, 829-830.)

Defendant points to evidence that an argument took place immediately before the shooting. From this evidence, defendant argues, the jury could have reasonably concluded that he shot Anna in the heat of passion, "his judgment clouded by his anger due to the quarrel." We perceive several problems with defendant's argument. At the outset, we observe that any connection between the argument and the shooting was tenuous at best. Lance testified that the argument seemed to come from a nearby home and seemed to involve a couple. Lance also testified that he did not recognize Anna's voice as one of the people involved in the argument. Given Lance's testimony, which was undisputed, we question whether substantial evidence supports a conclusion that the argument was connected to the shooting at all.[2] But even assuming that Anna argued with defendant, there was no evidence that she said or did anything to provoke an ordinarily reasonable person to deadly violence, or that defendant acted under the heat of passion. To the contrary, the evidence showed that Anna ate dinner with her siblings and then retired to her campsite. The evidence also showed that defendant appeared in the dark with a gun and fired several shots, leaving Anna dead on the ground. No evidence suggests that Anna instigated an argument or provoked defendant in any way. Likewise, no evidence suggests that defendant's reason was actually obscured as a result of a strong passion. Although defendant may have had strong feelings about homeless people, and justifiable concerns about crime in the area, we cannot say that such feelings or concerns " ' " 'would cause the ordinarily reasonable person of average disposition to act rashly and . . . from . . . passion rather than from judgment.' " ' " (*People v. Peau, supra,* 236 Cal.App.4th at pp. 829-830.)

---

[2] We note that Lance also testified that arguments were common in the area.

11

Moreover, even assuming the evidence was sufficient to warrant a heat of passion instruction, any error in failing to give the instruction was harmless under any standard of prejudice.  (*People v. Peau, supra,* 236 Cal.App.4th at p. 830 ["For our purposes, it is not necessary to decide which standard of prejudice applies because any error was harmless even under the more stringent *Chapman* [*v. California* (1967) 386 U.S. 18, 24] standard"]; accord, *People v. Franklin* (2018) 21 Cal.App.5th 881, 891.)  " 'Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions.' " (*People v. Peau, supra,* at p. 830.)

Jurors here were instructed pursuant to CALCRIM No. 521 that, "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."  "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing.  This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to [instruct on voluntary manslaughter based on heat of passion]." (*People v. Wharton* (1991) 53 Cal.3d 522, 572; accord *People v. Peau, supra,* 236 Cal.App.4th at pp. 830-831 [following the reasoning of *People v. Wharton, supra,* and concluding that, because the jury had been instructed on first degree murder under a theory of premeditation and deliberation pursuant to CALCRIM No. 521, the defendant's "conviction of first degree murder render[ed] any failure to give a heat-of-passion instruction harmless because the jury necessarily found that the murder was willful, deliberate, and premeditated"]; see also *People v. Franklin, supra,* 21 Cal.App.5th at p. 894 ["the jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and nullifies any potential for prejudice here"]; but see *People v. Berry* (1976) 18 Cal.3d 509, 518 [holding that the trial court's failure to

12

give a heat of passion instruction was not rendered harmless despite the fact that the defendant was convicted of first degree murder]; and see *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 [rejecting argument that conviction of first degree murder rendered the failure to give a heat of passion instruction harmless in light of *Berry*].)

On the record before us, we have little difficulty concluding that jurors would have returned the same verdict of first degree murder even if the trial court had instructed them on heat of passion voluntary manslaughter. We therefore conclude that any error was harmless. (*People v. Manriquez, supra,* 37 Cal.4th at p. 586.)

2.      *Imperfect Self-Defense*

" ' "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." . . . [I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter.' " (*People v. Manriquez, supra,* 37 Cal.4th at p. 581.)

The doctrine of imperfect self-defense " 'is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*People v. Manriquez, supra,* 37 Cal.4th at p. 581.)

13

In this case, the evidence showed that Anna ate dinner and retired to her campsite. There was no evidence that Anna accosted or threatened defendant. Nor was there any evidence that Anna possessed a weapon. And, though defendant evidently feared that homeless people might break into his home, there was no evidence that Anna attempted any such thing. Indeed, there was no evidence, of any kind, that defendant feared imminent peril when he shot Anna, or that Anna said or did anything that would lead to such fear. The record thus contains no substantial evidence to support a finding that defendant actually feared that Anna posed an " '*imminent* danger to life or great bodily injury' " that " ' " '*must be instantly dealt with.*' " ' " (*People v. Manriquez, supra,* 37 Cal.4th at p. 581; see also *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [no state or federal constitutional error occurs, requiring reversal for failure to instruct the jury regarding a lesser included offense, when the evidence in support of that offense "was, at best, extremely weak"].) The trial court, therefore, did not have a duty to instruct sua sponte on imperfect self-defense.

B.    *Sentencing*

Defendant next contends the trial court erred in failing to consider his service-related PTSD as a mitigating factor at sentencing. We agree.

Section 1170.91, subdivision (a), which became effective on January 1, 2019, provides, in pertinent part: "If the court concludes that a defendant convicted of a felony offense is, or was, a member of the United States military who may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of his or her military service, the court shall consider the circumstance as a factor in mitigation when imposing a term under subdivision (b) of Section 1170." Under section 1170, subdivision (b), "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." Together, sections 1170.91, subdivision (a) and 1170, subdivision (b) require that the trial court consider a

14

defendant's service-related PTSD as a circumstance in mitigation when selecting a term of imprisonment. (*People v. Panozo* (2021) 59 Cal.App.5th 825, 836 [Section 1170.91, subdivision (a) "unambiguously *obligate*[*s*] a sentencing court to consider a defendant's service-related PTSD, substance abuse, or other qualifying conditions in making discretionary sentencing choices"].) Nothing in the record indicates the trial court was aware of its duty to consider defendant's service-related PTSD as a mitigating factor in selecting the terms comprising defendant's determinate sentence.

"We review a trial court's sentencing decisions for an abuse of discretion, evaluating whether the court exercised its discretion 'in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an "individualized consideration of the offense, the offender, and the public interest." ' [Citation.] An abuse of discretion is found where the court 'relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision.' [Citation.] 'A failure to exercise discretion may also constitute an abuse of discretion.' [Citation.] ' "A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." ' " (*People v. Panozo, supra,* 59 Cal.App.5th at p. 837.)

The People observe that the trial court was aware of defendant's military service and mental health condition. We do not disagree. There were several discussions on the record about the possibility that defendant might suffer from PTSD as a result of his military service in Iraq. By the time of sentencing, the trial court had heard repeated mention of defendant's military service and mental health condition. But there was no mention of defendant's military service or service-related PTSD in the original probation

15

report or subsequent resentencing memorandum.[3]  Likewise, there was no mention of section 1170.91 in defendant's written motion to rerefer the matter to the probation department, or the probation department's written response.  And there was no mention of section 1170.91 at any sentencing hearing.  Indeed, there was no discussion, anywhere in the record, of the trial court's obligation to consider defendant's service-related PTSD as a circumstance in mitigation in selecting a term of imprisonment.  To the contrary, the record indicates the trial court refused to consider defendant's military service as a circumstance in mitigation and did not consider his service-related PTSD at all.  The record thus provides us with no basis for supposing the trial court appreciated its mandatory statutory duty to consider defendant's service-related PTSD as a mitigating factor at sentencing.  Under the circumstances, we conclude remand is necessary for the trial court to make a sentencing determination in light of the new statutory obligation imposed by section 1170.91.  (*People v. Panozo, supra,* 59 Cal.App.5th at p. 840 ["In short, our record necessitates remand because it is, at the very least, ambiguous as to whether the trial court was aware of its statutory obligations under sections 1170.9 and 1170.91"].)[4]

---

[3] We have not been provided with a copy of the original probation report; however, the parties and trial court all seemed to agree that defendant's military service was not covered there.

[4] Because we are remanding for resentencing, we need not consider defendant's other challenges to the trial court's conduct of the sentencing hearing.  It is also unnecessary for us to consider defendant's challenge to the trial court's calculation of court operations assessments (§ 1465.8) and court facilities fees (Gov. Code, § 70737), or defendant's contention that the dates on the abstract of judgment are incorrect, all of which the People concede.  These issues can be raised with the trial court on remand.

## III.  DISPOSITION

The matter is remanded for a new sentencing hearing at which the trial court shall discharge its statutory duty under section 1170.91.  In all other respects, the judgment is affirmed.

/S/

_____
RENNER, J.

We concur:

/S/

_____
ROBIE, Acting P. J.

/S/

_____
MURRAY, J.

17