Filed 8/12/15  P. v. Rivera CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060764 |
| v. | (Super.Ct.No. FVA901765) |
| ERIC ANDRE RIVERA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Affirmed with directions.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Lise Jacobson, and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION[1]

Defendant Eric Andre Rivera, age 22, a gang member, shot and killed Andrew Martin Kratt, age 18. The fatal shooting occurred on a street corner in Bloomington where Kratt was sitting on a curb, unarmed and smoking marijuana with his two underage cousins.

A jury convicted defendant of first degree murder. (§ 187, subd. (a).) The jury found true the allegations that defendant personally used and discharged a firearm, causing death. (§ 12022.53, subds. (b), (c), and (d)). The jury also found true that defendant acted for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C)). Defendant admitted having a prior strike conviction in 2003 for the crime of possession for sale of methamphetamine, with a gang enhancement. (Health & Saf. Code, § 11378; Pen. Code, §§ 667, subd. (a)(1), 1170.12, subd. (a).) The court sentenced defendant to 80 years to life.

On appeal, defendant argues the trial court failed to instruct sua sponte on voluntary manslaughter, based on sudden quarrel or heat of passion, and erred in excluding his extrajudicial statements to police. The parties agree the abstract of judgment should be corrected. We affirm the judgment as corrected.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

II

STATEMENT OF FACTS

*A. The Shooting*

In 2007, on the night of August 4, Andrew Martin Kratt and his cousins, Gabriel Dorame and Ronnie Godinez, were hanging out on the corner of 7th and Linden Streets in Bloomington. Dorame, age 14, was playing with his scooter and Kratt and Godinez were sitting on the curb and smoking marijuana. Defendant approached the three cousins, walking quickly with his head down and his hands in his pocket. Defendant wore a black hoodie sweatshirt and a black and white bandana covering his face, from his chin to the tip of his nose.

Kratt offered defendant "a hit" of the marijuana, using a "joking" type gesture. Defendant angrily demanded to know where Kratt was from. While still seated, Kratt replied, "Compton. Tortilla Flats." Defendant responded, "Fuck the fags," fired four shots at Kratt, and ran away. The cousins had all begun to stand up before the shooting but Kratt was still sitting when he was shot.

When Sheriff's Deputy Thomas Jolin arrived at the scene, Kratt was unconscious and not breathing. The autopsy found Kratt had suffered three gunshot wounds and a bullet severed his spinal cord. The bullet was lodged in the mid-chest and spinal canal. There were two entrance wounds, consistent with Kratt being shot while seated.

3

At the crime scene, the police found four .380-caliber shell casings. A black bandana with a white pattern on it was found about two-tenths of a mile away. DNA analysis of the bandana established a match with defendant.

About a week or two after the shooting, Godinez saw gang graffiti—"West Side Bloomas"— written at the corner where Kratt was shot. Godinez testified that, before the shooting, he obtained some marijuana from a person called "Burt" or "Smokes."

Sheriff's deputies, Neal Rodriguez and Frank Bell, interviewed defendant on April 8, 2009, during an unrelated incarceration. Sergeant Rodriguez told defendant that he was investigating Kratt's homicide and defendant denied knowing Kratt. Defendant admitted he was originally from Compton and he was once part of the Compton Locos gang and had gang tattoos. He denied he still "claimed" that gang. Defendant said his nickname was "Frosty," not "Slim." Defendant did not know where he was the night of Kratt's homicide. Although defendant had family and spent time in the Bloomas area, he had not been around for awhile. Defendant said he would try to help out with information.

After leaving the interview room, defendant talked to a fellow inmate who was a confidential informant (C.I.) wearing a hidden microphone and recording device. In their conversation, the C.I. repeatedly called defendant "Slim." Defendant told the C.I. he had told Rodriguez his nickname was not Slim but Frosty. Defendant said the interview was about the death of "Andrew Crat," the "fool from the flats" and "from Compton." Defendant told the C.I. somebody must have snitched on him and "Smokes." During the

4

incident, Smokes was driving a car.[2]  Defendant, wearing a bandana and a hoodie, was alone when he confronted Kratt about 8:00 p.m. on the street.  Defendant wanted someone to tell his girlfriend to get rid of the car and to tell "Smokey not to be running his mouth out there about that shit we did."  When the C.I. asked about the gun, defendant replied, "Yeah, it's been gone.  I gave it to the homies and I think they got cracked with it."

On January 19, 2010, Rodriguez contacted defendant under an arrest warrant and told him there was DNA evidence connecting him to a homicide.  Defendant made a phone call, apparently to his father, and said, "It's a wrap."[3]  Defendant was arrested for Kratt's murder.

B.  *Gang Evidence*

Fontana police officer, Buddy Porch, testified as a gang expert.  He identified Bloomas as a Hispanic criminal street gang with about 100 members.  The Bloomas gang claimed the area at 7th and Linden in Bloomington as their territory.  Porch explained that gang graffiti appearing at a homicide site expresses gang support and intimidation. Porch described defendant as an active Compton Varrio Locos associate of the Bloomas gang.  Porch explained a "transitional gang member" is someone who still pays homage

---

[2]  Smokes is Michael Cervantes, a Bloomas gang member.

[3]  It is not clear from the record whether defendant meant "wrap" instead of "rap" or possibly "trap."

5

to his original gang but associates with another gang in a different area in order to sell drugs.

Porch testified that defendant pleaded guilty to possession for sale of a controlled substance in 2008 in violation of Health and Safety Code section 11378 and admitted the Penal Code section 186.22, subdivision (b)(1), gang enhancement. Defendant committed the previous offense at his home in Bloomington where there was graffiti related to his original gang, the Compton Varrio Locos, and his gang moniker, Slim. Defendant also had Compton Varrio Locos gang tattoos: "Comptone [*sic*]" on his abdomen; a St. Louis Cardinals symbol on his back, signifying "L" for "Locos;" and "Locos" on his right arm. Defendant's two brothers were active members of the Compton Varrio Locos gang.

Porch testified the Compton Varrio Locos gang and the Compton Tortilla Flats gang, to which the victim belonged, are "bitter rivals." In 2007, the Locos would call the Flats "fags" to show disrespect. Law enforcement records from 2007 showed that the Locos used weapons to assault the Flats.

By asking "where are you from," a gang member intends to establish his territorial authority. If a Locos gang member associated with the Bloomas gang killed a Flats member in 2007, the killer would gain "major respect" from the Locos and the Bloomas gangs. The Bloomas gang members would view the killer as showing allegiance by respecting their area and protecting their territory. Porch's opinion was defendant killed Kratt for the benefit of, in association with, or in furtherance of the Bloomas gang.

6

*C. Defense*

Defendant did not testify or present an affirmative defense. Defense counsel argued to the jury that there was no evidence defendant was wearing the bandana at the time of the shooting and there was no evidence of premediatation. Instead, defendant may have overreacted to Kratt and his cousins. Defense counsel asked the jury to return a verdict of second degree murder and to find the gang allegation not true.

III

VOLUNTARY MANSLAUGHTER

Defendant argues that, given the context, the evidence justified the trial court giving an instruction sua sponte on voluntary manslaughter based on sudden quarrel or heat of passion. Defendant argues the victim provoked defendant by his presence as a rival gang member in Bloomas gang territory. We conclude no substantial evidence supported defendant's theory he killed Kratt because of a sudden quarrel or in the heat of passion.

The law requires the trial judge to instruct the jury on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. (*People v. Peau* (2015) 236 Cal.App.4th 823, 830; *People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) No such duty to instruct exists when there is no evidence that the crime was less than the one charged. (*People v. Banks* (2014) 59 Cal.4th 1113, 1159.) A sua sponte instruction on the 1esser included crime of voluntary manslaughter, based on either imperfect self-defense or heat of passion, is required only

when there is "substantial evidentiary support" for either theory. (*Breverman,* at pp. 153, 160, 162; *People v. Barton* (1995) 12 Cal.4th 186, 201; *Banks,* at pp. 1160-1161.) The reviewing court conducts an independent review of the failure to instruct on a lesser included offense, using the *Watson* harmless error analysis. (*Banks,* at pp. 1160-1161; *People v. Watson* (1956) 46 Cal.2d 818, 837.)

The trial court expressly observed there was no evidence to support a jury instruction on voluntary manslaughter, imperfect self-defense or self-defense, instead of murder. Kratt was unarmed and the only "provocation" he gave defendant was to start to get to his feet. Both eyewitnesses, Dorame and Godinez, testified Kratt was still seated when defendant shot him. Their testimony was corroborated by the evidence about the trajectory of the bullets within the victim's body. The only lesser offense supported by the evidence presented at trial was second degree murder. Accordingly, the court instructed the jury on the elements of first and second degree murder, and that provocation "may reduce a murder from first degree to second degree." (CALCRIM Nos. 520, First or Second Degree Murder with Malice Aforethought; 521, First Degree Murder, and 522, Provocation: Effect on Degree of Murder.)

There was no evidence that the crime committed by defendant was less than murder. In his description of defendant's conduct, defendant's appellate counsel wildly exaggerates what occurred as "[t]he nighttime encounter of two rival Compton gang members." First, he blames Kratt for living at his cousin's house located in Bloomas territory. Kratt's "unsanctioned and ongoing presence on another gang's turf was a

8

provocative act," according to defendant. Then, when defendant "taunted" Kratt about his gang affiliation, Kratt's cousins expected "trouble to ensue," and Kratt and his cousins began to stand up, at which point defendant fired on Kratt.

What happened, however, could not reasonably be characterized as provocation by Kratt. Defendant aggressively confronted Kratt and his cousins and killed Kratt in a deliberate and premeditated killing in the first degree. The trial court did not err by not instructing the jury on voluntary manslaughter. We reject the claim of instructional error.

Furthermore, any instructional omission was harmless. There was no reasonable probability of a different outcome had the instruction been given. The jury was instructed on both first and second degree murder, as well as on provocation sufficient to reduce first degree to second degree. It returned a verdict of murder in the first degree, thus finding that defendant killed with deliberation and premeditation. The record contains overwhelming evidence in support of the jury's verdict of first degree murder and not second degree murder. The jury could not plausibly have found a lesser crime. The instructional error, if any, was harmless beyond a reasonable doubt even under the *Chapman* standard. (*People v. Peau, supra,* 236 Cal.App.4th at pp. 830, 832, citing *Chapman v.California* (1967) 386 U.S. 18, 24.)

IV

EXTRAJUDICIAL STATEMENTS TO POLICE

Defendant next argues the trial court prejudicially erred by excluding his January 2010 recorded statements to police because those statements explained his state of mind

9

in August 2007. In particular, he asserts his statements should have been admitted under Evidence Code section 356 to offset Sergeant Rodriguez's testimony that defendant had been told that DNA connected him to the murder and that defendant then called his parents to say, "It's a wrap." We conclude there was no error because the statute does not apply to successive statements made over a period of time. Furthermore, any error was harmless.

At trial Sergeant Rodriguez testified that defendant was interviewed initially on April 8, 2009, when he denied knowing Kratt or being involved in the murder and he offered to help Sergeant Rodriguez. Immediately after the interview, defendant told the C.I. that he had killed Kratt and disposed of the gun. He needed his girlfriend to dispose of the car and he wanted his cohort not to talk about the crime. The officer further testified that, on January 19, 2010, based on an arrest warrant, he contacted defendant and told him that DNA evidence connected him to a homicide. When defendant was allowed to make a phone call, defendant told his father, "It's a wrap." Defendant wanted to introduce a three-part, 181-page interview to offset the testimony about the DNA connection and defendant's phone call.

Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any

10

other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

The trial court offered a tentative ruling regarding the admissibility of defendant's extrajudicial statements to Sergeant Rodriguez. First, the court noted defendant's April 2009 statement to law enforcement, in which he had "adamant[ly]" denied any involvement in the instant shooting. The court found such evidence was relevant to the totality of the circumstances and showed consciousness of guilt. Comparing defendant's April 2009 statement to the confidential informant and his January 2010 statement, the court observed that, although defendant admitted committing the shooting, in January 2010, "in his mind it was done either by way of peer pressure and/or also self-defense; that he had a fear that he was going to be shot at the time." The court found that Evidence Code section 356, which governs the admissibility of entire conversations, did not require admission of the January 2010 statement to give context to defendant's other statements in April 2009.

The court explained that section 356's rule of completeness only applies to a statement made on the same occasion or at the same time. The rule did not apply to defendant's January 2010 statement because it occurred long after his initial statement to police in April 2009. The trial court concluded that the court is not required to admit "all statements made by the defendant to law enforcement." Additionally, Evidence Code section 1220, did not authorize the admission of the January 2010 statement because section 1220 only allows an admission "when offered against the declarant not for the

11

declarant." Finally, the court ruled the only way to admit the January 2010 statement would be for defendant to testify at trial and be subject to cross-examination.

Later in the trial, the court again denied admission of the January 2010 statement when it found Sergeant Rodriguez did not actually testify about defendant's statements but only testified about what he told defendant before defendant made his phone call, which "would put in context what he [the officer] overheard during the course of that phone conversation."

The statutory purpose of section 356 is "'to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' (*People v. Arias* (1996) 13 Cal.4th 92, 156.)" (*People v. Vines* (2011) 51 Cal.4th 830, 861; *People v. Guerra* (2006) 37 Cal.4th 1067, 1121-1122.) Here, as noted by the trial court, the People did not introduce any statements made by defendant on January 19, 2010. The prosecution only elicited a statement made by the officer about DNA evidence linking defendant to a murder. There was nothing misleading about the officer's testimony that, after he told defendant about the DNA, he overheard defendant, in a telephone conversation with someone else, say, "It's a wrap." Under these circumstances, Evidence Code section 356 did not permit admission of defendant's January 2010 statement about his state of mind.

Even so, any error was harmless. No rational jury would have believed defendant's self-defense claim. Kratt was seated, or was starting to his feet, when defendant killed him. Kratt was friendly, offering to share his marijuana. Defendant was

12

the aggressor who shot Kratt repeatedly. Defendant bragged about the shooting to the C.I. Under these circumstances, it is not reasonably probable that a more favorable verdict would have resulted had defendant's January 2010 statements been presented at trial. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) It was not an abuse of discretion to exclude the evidence. (*People v. Geier* (2007) 41 Cal.4th 555, 586.)

V

CORRECTION OF ABSTRACT OF JUDGMENT

At the sentencing hearing, the trial court imposed a term of 25 years to life on count 1, then doubled it because of defendant's prior strike, resulting in a total of 50 years to life. The court punished defendant with a term of 25 years to life for the enhancement under section 12022.53, subdivision (d), for discharging a firearm and causing great bodily injury or death. A determinate term of five years was imposed for the prior conviction under section 667, subdivision (a)(1). The remaining enhancements were imposed and stayed. The trial court thus imposed "a 5-year determinate sentence followed by 75 years to life."

The abstract of judgment incorrectly shows only 25 years as an enhancement under "PC 12022.53(C)." The oral pronouncement was an enhancement of 25 years to life under a different statutory provision, section 12022.53, subdivision (d). The abstract should be corrected in paragraph 2 to state "25 years to life" instead of "25," and the statutory reference should be to subdivision (d), not (c), of section 12022.53.

13

Additionally, the abstract shows in paragraph 6, item c, that he was sentenced to "75 years to Life on counts 1." Paragraph 6 further states "PLUS enhancement time shown above." The entry in 6c should thus be corrected to indicate "50 years to life" instead of "75 years to life."

## VI

## DISPOSITION

We order the abstract of judgment be corrected to replace "25" and "12022.53(c)" with "25 years to life" and "12022.53(d)" in paragraph 2 and to replace "75" with "50" in paragraph 6.

We affirm the judgment as corrected and order a copy of the corrected abstract be forwarded to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

14