Filed 12/7/20  P. v. Diaz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RIGOBERTO GONZALEZ DIAZ,<br><br>Defendant and Appellant. | F078005<br><br>(Super. Ct. No. 17CR05571)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Jeanne Schechter, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Rigoberto Gonzalez Diaz[1] guilty of willful, deliberate, and premeditated murder (Pen. Code,[2] §§ 187, subd. (a)/189; count 1) against Maria Vargas. In addition, the jury found appellant had personally used a dangerous or deadly weapon, to wit, a knife in the commission of the crime (§ 12022, subd. (b)(1)).  Appellant was sentenced to a prison term of 25 years to life for count 1, plus an additional year for the deadly weapon enhancement, for a total prison term of 26 years to life.

On appeal, appellant contends the evidence was constitutionally insufficient to support the jury's finding that the murder was willful, deliberate, and premeditated. Appellant also contends the trial court reversibly erred by failing to instruct on heat of passion voluntary manslaughter sua sponte.  In the alternative, he contends his trial counsel provided ineffective assistance by failing to request the instruction.  Finally, appellant contends the trial court violated his due process rights by imposing certain fines and fees without making a determination of his ability to pay them.  We affirm.

## FACTS

Early in the morning of September 1, 2017, law enforcement was dispatched to a canal near an orchard.  Vargas's body was found in the canal with "drag marks" in the ground leading to it.  Vargas's vehicle was parked nearby, and there was a puddle of blood surrounded by an area of disturbed dirt in the orchard.  Appellant's fingerprints were found on the outside and inside handle of the passenger door of Vargas's vehicle.

Law enforcement went to appellant's residence on September 4, 2017, and observed boots with red stains sitting outside the front door.  The tread on the boots was consistent with boot prints found at the scene.  The boots were seized and sent to the Department of Justice with samples of appellant's and Vargas's DNA.  The red stains on

---

[1]     Appellant's name was listed on the information as Bernabe Gonzalez.  Before trial, the information was amended to reflect his true name.

[2]     All further undesignated statutory references are to the Penal Code.

2.

appellant's boots was blood matching the DNA profile of Vargas, which the criminalist testified was strong evidence Vargas was the source of the DNA on the boots.

Law enforcement interviewed appellant on September 7, 2017. Appellant said he had known Vargas for four and a half years. She began flirting with him three years ago, but nothing happened between them until approximately three weeks or a month ago when he started talking to her without his wife knowing. Vargas told appellant that she liked him and they began talking every day. They agreed not to leave their families for each other but started talking about the possibility of having an affair. They started seeing one another but did not have sex.

When appellant got home from a week-long vacation with his family, Vargas was desperate to talk to him. Appellant felt bad for betraying his wife, but the day before Vargas was killed, Vargas called appellant multiple times and wanted to see him. He expressed to Vargas that she never did anything physical with him, so Vargas promised that if they saw one another she would. They agreed to meet on September 1, where, as appellant put it, "the accident happened."

On September 1, appellant and Vargas parked their cars on the street near the orchard. He got into her car, and they talked. They then walked toward the orchard and started to kiss and caress. When they got to the point where they were almost having sex, Vargas told appellant she did not want to. Appellant told Vargas she was "wasting my time" and "playing with me" and that he was leaving. Vargas grabbed appellant and told him they could have sex in the car, but he was upset. Appellant told Vargas the car was too close to the street and someone could see them. Appellant told Vargas "it has to be here." Vargas said she did not feel comfortable, and appellant began to get more upset.

At this point in appellant's account, he told law enforcement, "And I had, well, a knife. Okay." Appellant explained he normally uses the knife for his job working with horses, and uses it to cut things like bales of hay. Appellant then said, "I don't know exactly what happened to me at that moment, if it was because she just made me waste

3.

my time or I just lost it." Appellant explained Vargas wanted to continue kissing appellant, so appellant "pretended [he] was going to kiss her neck from behind" and "that's when [he] hit her with the knife." Appellant said he kissed her until she started to "relax" and get "excited." He then took out the knife, opened it slowly, and gave her a "small cut."

Appellant said Vargas started to run and appellant pulled her by the hair. Vargas fell and tried to run, and he "panicked." Appellant said he "knew that if, well, she left with the [first] cut [I gave her]–because it was something small," "well she was going to put me–[I was] going to end up where I am right now [with the police]" and "my family also was going to end up in … trouble." Appellant said his "head closed from the world…. I did not know what else to do" and should "more than finish what I started." He said it may not have been what he wanted, but "when [he] saw the small cut," "well I had to finish the job."

Appellant was on top of Vargas and he had gone "into shock." Appellant said Vargas was screaming at him to stop, "[b]ut [he] could not let her go anymore." Appellant said he started squeezing her neck to choke her, but he ran out of strength in his hand and she tried to defend herself by biting and scratching him. Once Vargas began to suffocate, appellant stabbed her with his knife four or five times. After appellant stabbed her twice in the chest, she stopped moving, but she made a little noise, so appellant cut her neck. Appellant explained that if Vargas lived, she would have called the police, so "the only thing I think [is] to kill," a "bad thing but I think that." The officer asked appellant if he would have killed Vargas if Vargas had had sex with him and he responded, "[p]robably not."

Appellant then thought about what to do with the body and decided to put her in the canal. He threw her in the canal to be sure she was "100%" dead. Appellant went home and burned the clothes he was wearing in the back yard. Later that day, he told his

wife immigration was looking for him and they needed to leave for Mexico. He was stopped and arrested in Phoenix.

The detective who interviewed appellant testified he believed appellant was being truthful in his interview. Another sergeant who was present at appellant's interview testified there were no contradictions between appellant's statements and his investigation of the scene and interviews with Vargas's husband and appellant's wife.

The forensic pathologist who performed Vargas's autopsy testified the cause of death was multiple stab wounds and incised wounds. Vargas had two superficial stab wounds on her forehead. She had a jagged incised wound or long cut across the front of her neck, which almost cut her trachea into two pieces. She had another stab wound on the neck near the incised wound, which hit her breastbone. There were five stab wounds to her chest and one to her abdomen. Two of the stabs went through the sack of the heart and one perforated her aorta. She had wounds to both lungs and one of the stabs perforated her colon. Two structures that are attached to the larynx were broken, which was indicative of an impact to her neck, in that it was grabbed somehow and squeezed, but that was the only finding suspicious for strangulation. Vargas had defense wounds, one of which was indicative of her grabbing the knife to ward it off. Vargas also had scrapes on her back indicative of being dragged.

## DISCUSSION

### I. Sufficiency of the Evidence

Appellant contends the evidence was constitutionally insufficient to support the jury's finding that the murder was willful, deliberate, and premediated. We disagree.

In assessing a claim of insufficiency of the evidence, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Reversal on insufficiency of the

evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

In the context of premeditated and deliberate murder, " ' premeditation means " 'considered beforehand' " [citation] and deliberation means a " 'careful weighing of considerations in forming a course of action …' " [citation].  "The process of premeditation and deliberation does not require any extended period of time." ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)  " 'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly….' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)  Ultimately, a finding of deliberation and premeditation requires the existence of "preexisting reflection, of any duration." (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)

Our California Supreme Court outlined three categories of evidence helpful in determining whether evidence is sufficient to support a finding of deliberation and premeditation in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*).  They are: (1) facts of activity "directed toward, and explicable as intended to result in, the killing" or *planning* evidence; (2) *motive* to kill evidence; and (3) evidence that the *manner* of killing was "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design.' " (*Id.* at pp. 26–27.)  These factors are meant to be used as a guide in examining the sufficiency of the evidence of deliberation and premeditation, and "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

Here, as for "planning" evidence, in contrast to many cases, appellant has outlined his thought process in the moments before the killing.  Appellant's statement provides a roadmap from which the jury could easily infer appellant weighed considerations before

6.

deciding to kill Vargas. We note the first cut appellant gave Vargas was the result of a calculated ruse to lull her into a sense of relaxation by pretending to kiss her. Appellant indicated he slowly opened the knife before cutting her. These facts do not show he acted out of a rash impulse but rather indicate reflection before cutting her for the first time and planning. Even if, at that point, he had decided only to cut Vargas but not kill her, these facts are indicative of the depth of reflection and appellant's relatively calm state of mind leading to that first cut. It was no later than shortly after appellant cut Vargas for the first time that he made the decision to kill Vargas. Appellant explained to law enforcement in no uncertain terms, that he decided to kill Vargas so she would not go to the police because of the first cut. Appellant's statements to law enforcement demonstrate a weighing of considerations: let Vargas go and risk her going to the police or kill her and potentially avoid detection. This constitutes sufficient "planning" evidence. "The act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [a defendant's statement he saw his niece's face in the mirror before turning to stab her supported an inference he planned to kill her because upon seeing her in the mirror he realized she was witness to a killing he committed].) Appellant's statement that he killed Vargas so she would not go to the police also falls into the "motive" type of evidence. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1019 [avoiding police detection of another crime is sufficient evidence of motive to kill].)

The "manner of killing" also indicates premeditation and deliberation. Appellant first attempted to strangle Vargas; however, appellant began to lose strength and Vargas was attempting to defend herself. Once she started to suffocate, appellant switched methods and delivered several stab wounds to vital areas of her body. By appellant's own admission, he made a long cut across her throat and threw her into the canal to make sure she was dead. The jury could infer from this manner of killing that appellant was committed to carrying out his plan to kill Vargas to completion despite having

7.

opportunities to reconsider and change course and, accordingly, that the killing was premediated and deliberate. (See *People v. Brady* (2010) 50 Cal.4th 547, 564 [manner of killing sufficient to support finding of premeditation and deliberation where the defendant fired one shot at officer, got out of his car, shot the officer again in the back as the officer was retreating, and stood over the officer's prone body and fired a third shot].)

Appellant insists there is insufficient evidence appellant planned to kill Vargas before meeting her at the orchard. Our analysis does not presume any decision to kill Vargas before meeting her at the orchard. Rather, as we have explained, this is a case falling under a well-settled principle that, "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 767; *People v. Solomon*, *supra*, 49 Cal.4th at p. 812.) As we have explained, there was ample evidence appellant decided to kill Vargas following a period, however short, of reflection.

The jury's finding of deliberation and premeditation was supported by sufficient evidence.

## II. Heat of Passion Voluntary Manslaughter Instruction

### A. *Relevant Background*

At a jury instruction conference at the close of evidence, the trial court referenced an email between the court and counsel wherein defense counsel indicated he agreed with the prosecutor's assessment that there was insufficient evidence to support an instruction on heat of passion voluntary manslaughter. Defense counsel confirmed he was not requesting the instruction. The court responded, "Okay. And I agree. I just don't think there's sufficient evidence to cause an average, reasonable person to become so inflamed that they lose their reason and judgment thus mitigating the crime down to a voluntary manslaughter."

8.

## B.     Trial Court's Duty to Instruct

Appellant contends the court reversibly erred in failing to instruct the jury sua sponte with the heat of passion theory of voluntary manslaughter.  We disagree.

The trial court has a sua sponte duty to "instruct fully on all lesser necessarily included offenses supported by the evidence."  (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.)  An instruction on a lesser included offense is not warranted unless it is supported by "substantial evidence," meaning "evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense."  (*People v. Shockley* (2013) 58 Cal.4th 400, 403–404.)

Voluntary manslaughter is a lesser included offense of murder.  (*People v. Rios* (2000) 23 Cal.4th 450, 460.)  Unlike murder, manslaughter lacks the element of malice.  (*Ibid*.)  "Heat of passion" is a theory of "partial exculpation" that serves to reduce murder to manslaughter by negating the element of malice.  (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1015–1016; *People v. Beltran* (2013) 56 Cal.4th 935, 942.)  The provocation required to reduce murder to voluntary manslaughter must be sufficient to cause an " ' "ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection." ' "  (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

Assuming without deciding that the court erred by deciding not to instruct on heat of passion voluntary manslaughter, we conclude any error was clearly harmless beyond a reasonable doubt.[3]

"Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions

---

[3]     The parties disagree as to whether we must analyze prejudice under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836) or the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24).  Because we find no prejudice under the stricter *Chapman* standard, we need not resolve this question.

adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

In *People v. Wharton* (1991) 53 Cal.3d 522 (*Wharton*), the California Supreme Court found the trial court had erred by refusing the defense's request to instruct the jury that provocation for heat of passion voluntary manslaughter could occur over a "considerable period of time." (*Id*. at pp. 569, 571.) The trial court otherwise gave comprehensive instructions on provocation and heat of passion. (*Id*. at p. 570.) The court noted the jury was instructed that a killing is first degree murder if it is " 'the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not upon sudden heat of passion.' " (*Id*. at p. 572.) The court found the error harmless, concluding: "By finding defendant was guilty of first degree murder, the jury necessarily found [the] defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion …." (*Ibid*.)

Here, the jury was instructed that "[p]rovocation may reduce a murder from first degree to second degree" and the "weight and significance of the provocation" was for the jury to decide. (CALCRIM No. 522.) The jury was instructed that it could not find premeditation and deliberation unless the People proved beyond a reasonable doubt that appellant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." (CALCRIM No. 521.) The jury was further instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.) A determination that appellant carefully weighed his choice to act and did not decide rashly or impulsively cannot co-exist with the heat of passion, which "arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act *rashly and without deliberation* and reflection, and from such passion rather than from

10.

judgment.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201, italics added; see *People v. Franklin* (2018) 21 Cal.App.5th 881, 894 (*Franklin*).) For these reasons, we conclude the jury's finding of premeditation and deliberation is "manifestly inconsistent with having acted under the heat of passion" and any error committed by failing to instruct on heat of passion voluntary manslaughter was not prejudicial. (*Wharton*, *supra*, 53 Cal.3d at p. 572; *People v. Peau* (2015) 236 Cal.App.4th 823, 831 (*Peau*); *People v. Speight* (2014) 227 Cal.App.4th 1229, 1246; *Franklin*, at p. 894; see *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1138.)

We acknowledge that in *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), a case which precedes *Wharton* and on which appellant heavily relies, the California Supreme Court reversed a first degree murder conviction where the court found the trial court erred by refusing the defendant's request to instruct on heat of passion voluntary manslaughter. (*Berry*, at p. 518.) There, the trial court made a passing reference to heat of passion but did not instruct on heat of passion voluntary manslaughter. (*Ibid.*)

Division One of the First Appellate District in *Peau* addressed the "tension" between the *Berry* and *Wharton* decisions and concluded that *Wharton* is controlling in circumstances substantively similar to those presented here. (See *Peau*, *supra*, 236 Cal.App.4th at pp. 831–832.) In *Peau*, the First District noted that the *Berry* decision did not mention that first degree murder must be willful, deliberate, and premeditated and that it appears "the sole issue considered in *Berry* was whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a finding was inconsistent with a finding that the defendant acted in a heat of passion." (*Peau*, at pp. 831–832.) Citing *People v. Brown* (2012) 54 Cal.4th 314, 330 for the proposition that " 'cases are not authority for propositions not considered,' " the *Peau* court concluded *Berry* did not preclude its conclusion that a jury's finding that a murder was premeditated and deliberate rendered

11.

any error in failing to instruct on heat of passion voluntary manslaughter harmless beyond a reasonable doubt. Division One of the Fourth Appellate District has agreed with the *Peau* court (*Franklin*, *supra*, 21 Cal.App.5th at p. 894 [attempted murder]), as do we.[4]

We conclude the error was harmless beyond a reasonable doubt based on the instructions given here, because the jury in this case necessarily concluded defendant " 'carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill' " and " 'such a finding 'is manifestly inconsistent with having acted under the heat of passion.' " (See *Peau*, *supra*, 236 Cal.App.4th at pp. 831–832.)

## C.    *Ineffective Assistance of Counsel*

In the alternative, appellant argues that his trial counsel's failure to request an instruction on voluntary manslaughter constituted ineffective assistance of counsel. To prevail on a such a claim, appellant must establish that (1) the performance of his trial counsel fell below an objective standard of reasonableness; and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Anderson* (2001) 25 Cal.4th 543, 569.) A reviewing court will find prejudice when a defendant demonstrates a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*People v. Gurule* (2002) 28 Cal.4th 557, 610.)

---

**4**    We acknowledge Division One of the Second Appellate District in *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 has come to a different conclusion than we do here. The court in *Ramirez* relied on *Berry* to conclude an erroneous omission of an instruction on heat of passion voluntary manslaughter is not rendered harmless by a jury determination that the defendant was guilty of first degree murder rather than second degree murder. The *Ramirez* court makes no mention of *Wharton*. We find the analysis of courts who have attempted to reconcile *Wharton* and *Berry* more persuasive and for the reasons set forth in this opinion, respectfully disagree with the reasoning in *Ramirez*.

12.

This claim fails because, as we have explained, appellant has not shown prejudice resulted from any alleged error. Because we find no prejudice applying the *Chapman* standard, we necessarily find there is no reasonable probability but for any alleged ineffective assistance of counsel, there was a reasonable probability of a more favorable outcome. Accordingly, appellant's claim fails.

## III. Ability to Pay Fines and Fees

The court ordered appellant to pay a $7,800 restitution fine (§ 1202.4, subd. (b)) and imposed and stayed a parole revocation fine in the same amount (§ 1202.45). The court additionally ordered a $40 court security fee (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373). Appellant challenges these fines and fees based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

In *Dueñas*, Division Seven of the Second Appellate District held that the imposition of the court security fee (§ 1465.8, subd. (a)(1)) and the criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)), without a determination of the defendant's ability to pay them, violates the constitutional guarantee of due process. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The *Dueñas* court also held that if the defendant has demonstrated an inability to pay the restitution fine (§ 1202.4, subd. (b)(1)), the trial court must stay execution of the fine until the People prove the defendant has gained the ability to pay. (*Dueñas*, at p. 1164.)[5]

We conclude the issue is forfeited. Here, the court imposed a $7,800 restitution fine without objection. Pursuant to section 1202.4, subdivision (d), the court is permitted to consider appellant's inability to pay, among other factors, in setting the restitution fine

---

[5] The questions of whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments and, if so, which party bears the burden of proof regarding a defendant's inability to pay are currently pending before the California Supreme Court in *People v. Kopp*, review granted November 13, 2019, S257844.

13.

above the minimum of $300.  By failing to object to the imposition of an amount well over the minimum, appellant forfeited any ability to pay argument with regard to the restitution fee.  It follows that since appellant did not complain of the $7,800 restitution fine, he would not complain of the relatively nominal $40 and $30 assessments imposed pursuant to section 1465.8, subdivision (a)(1) and Government Code section 70373, subdivision (a)(1), respectively.  (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154; see also *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

### **DISPOSITION**

The judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


HILL, P.J.


PEÑA, J.

14.