Filed 6/21/23  P. v. Ambriz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>JUAN PABLO GONZALEZ AMBRIZ,<br><br>     Defendant and Appellant. | F084419<br><br>(Kern Super. Ct. No. BF180782A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant and appellant Juan Pablo Gonzalez Ambriz (defendant) appeals his convictions for first degree murder, attempted murder, and assorted other crimes related to firing an assault rifle at a moving vehicle. Defendant asserts the trial court erroneously failed to give instructions on self-defense and imperfect self-defense. We agree with the trial court and find no error in its decision not to instruct on self-defense or imperfect self-defense.

Further, defendant claims the instructions on homicide given in this case – which were standard CALCRIM instructions – created an erroneous impression that provocation must be judged solely objectively for all parts of the instructions. Defendant claims this misstates the law. Defendant failed to object to these instructions at trial, and we therefore find this issue forfeited. Even if no forfeiture had occurred, we would not find error in these standard instructions.

Finding no error, we affirm.

## PROCEDURAL SUMMARY

On June 25, 2020, the Kern County District Attorney filed an information charging defendant with the first degree murder of Anthony Moreno (Pen. Code, § 187, subd. (a);[1] count 1); three counts of attempted murder (§§ 664, 187, subd. (a); counts 2, 3, and 4); three counts of assault with a deadly weapon (§ 245, subd. (a)(3); counts 5, 6, and 7); one count of maliciously and willfully discharging a firearm at an occupied motor vehicle (§ 246; count 8); one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 9); one count of being a felon in possession of ammunition (§ 30305, subd. (a)(1); count 10); one count of possession of an assault weapon (§ 30605; count 11); one count of receiving a large capacity magazine (§ 32310; count 12); and one count of altering, removing, or obliterating a firearm's identification marks (§ 23900; count 13). The information alleged a firearm enhancement pursuant to section 12022.53

---

[1] All further statutory references are to the Penal Code except as otherwise noted.

to counts 1, 2, 3, 4, and 8, and an assault weapon enhancement pursuant to section 12022.5(b) to counts 5, 6, and 7.

On April 20, 2022, a jury found defendant guilty of each of the charged crimes, except count 13, on which it returned a verdict of not guilty. The jury also found true the firearm enhancement alleged pursuant to section 12022.53 in connection with counts 1, 2, 3, 4, and 8, and the assault weapon enhancement alleged pursuant to section 12022.5 in connection with counts 5, 6, and 7.

The trial court sentenced defendant on May 18, 2022 to an aggregate term of 50 years to life plus 60 years in prison as follows: on count 1, 25 years to life, plus a term of 25 years to life pursuant to section 12022.54, subdivision (d); on each of counts 2, 3, and 4, to life with a minimum parole eligibility of seven years, plus a term of 20 years pursuant to section 12022.5, subdivision (3)(c); on each of counts 5, 6, and 7, eight years (the middle term), plus six years pursuant to section 12022.5, subdivision (b); on count 8, five years, plus 25 years to life, pursuant to section 12022.53, subdivision (d); and on each of counts 9, 10, 11, and 12, two years (the middle term). The sentences on counts 5 through 11 were stayed pursuant to section 654. The sentences on counts 1 through 4 were imposed consecutively. The sentence on count 12 was imposed concurrently.

Defendant timely filed a notice of appeal on May 25, 2022.

## FACTUAL SUMMARY

On the afternoon of April 26, 2020, two brothers, Angel and Anthony,[2] were washing their mother's car outside of their home on the outskirts of Bakersfield. They noticed defendant driving a car recklessly past the house at a high rate of speed, peeling its tires in the street, and doing donuts, before racing back past the house. Angel testified his young cousins were playing in the front of the house, and Anthony ran out to try to

---

[2] Since all victims in this case share the same last name, they will be referred to by their first names for clarity's sake.

3.

get the driver's attention, without success. The next time the driver sped past, Anthony threw a water bottle at the car, although the driver still did not stop the vehicle. Since the driver did not stop and was continuing to speed past the house, Angel and Anthony decided to follow the car in Anthony's truck. Their cousin Cesar, who happened to be driving down the road, arrived at the front of the house at the same time Angel and Anthony were leaving, and followed the brothers in a separate car as well. However, the teenagers lost sight of the car they were pursuing and turned around and returned to their house.

Almost as soon as the trio arrived back at their house, the same car – which was ultimately revealed to be defendant's car – sped past their house again at a high rate of speed. Anthony, Angel, and Cesar again left to pursue defendant's car. As they were leaving, their uncle Jose was pulling up to the property. Jose followed the two cars separately in a third car. This time, the victims were able to follow defendant to his house a few miles away.

Upon arriving at defendant's house, Jose, Cesar, and Anthony got out of their cars. The parties engaged in a verbal altercation outside of defendant's house, with Jose, Cesar, and Anthony standing on the outside of a chain link fence and defendant standing in the yard inside of the chain link fence. While several video surveillance cameras played at trial both showed defendant speeding past the victims' house, and showed the altercation in front of defendant's house, none of the videos contained audio. Jose testified he asked defendant why he was driving so recklessly and told him there were children at their house he might be endangering. Defendant responded with numerous expletives and told Jose he did not care about him or his children and would drive however he wanted. The conversation escalated at this point, and both sides challenged each other to fight, with defendant telling Jose, Cesar, and Anthony to come inside of the gate to fight him, and Jose, Cesar, and Anthony telling defendant to come out into the street if he wanted to

4.

fight them.[3] Defendant asked Jose and the others if they were there to jump him, and Jose replied they were not, but they wanted him to stop driving so recklessly near their house. Defendant continued to make obscene gestures, and curse and yell at Jose and Cesar, who yelled back at defendant, before returning to their cars and leaving. Neither defendant nor any of the victims displayed any weapons, touched one another, or threatened to use weapons against each other during this verbal altercation. While a short chain link fence separated them, the front gate was hanging open a few feet away. No one attempted to pass through the open gate.

Jose, Cesar, Anthony, and Angel returned to the family's property and went to the rear of the property, where there was a pool and additional dwelling units, to spend time with the rest of their family. However, a short while later, defendant again drove past the house at a high rate of speed. Unbeknownst to the victims, defendant had an AR-15-style assault rifle in his car with him at that time, which the prosecutor characterized in his closing as defendant "gunning for" and "trying to find" the victims. Defendant then returned to his house. Jose, Cesar, Anthony, and Angel drove back to defendant's house, this time all in Jose's vehicle. The group pulled up next to defendant's car, which was parked in front of the house. Defendant was sitting in a lawn chair in the yard, on the opposite side of the car from the group. Cesar briefly exited the car and popped the tires on defendant's car with a pocketknife. Cesar re-entered the car, and the group drove away. This time, Jose's car was stopped for only a matter of seconds.

Because defendant lived on a dead-end street, the group was forced to turn around and drive back past defendant's house in order to exit the neighborhood. After turning around, the group noticed defendant standing in his front yard holding an assault rifle as they drove past the house. Everyone ducked, and witnesses testified they heard between two and four shots fired by defendant at the car as they drove past. One of the bullets entered the rear of Jose's vehicle and struck Anthony in the back. Jose drove

---

[3] Angel testified that he remained with Anthony's truck.

5.

immediately to the Kern Medical Center, where Anthony died later that day from the gunshot wound he sustained.

Defendant acknowledged to officers who arrived a short while later that he had fired a weapon, told the officers it was his weapon, and allowed the officers to search his property, where an assault rifle was located. The rifle had an extended magazine, with a bullet in the chamber. Several shell casings were found on the ground outside defendant's residence. Defendant did not contest that he shot Anthony or fired at the vehicle.

## DISCUSSION

Both of defendant's arguments relate to how the jury was instructed in this case. The first concerns whether instructions that were not given should have been given, whereas the second contends the instructions misstate the law. Neither claim has merit.

" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) A trial court has a duty to instruct on a lesser included offense or an affirmative defense[4] "only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial.' " (*People v. Barton*,

---

[4] Defendant objects to the trial court's failure to instruct on both self-defense and imperfect self-defense. Some confusion often arises with these terms. (*See People v. Barton* (1995) 12 Cal.4th 186, 199–201.) "Self-defense" is an affirmative defense on which the defendant bears the burden of proof at trial. (*Ibid.*) "Imperfect self-defense" – also sometimes called "unreasonable self-defense" – is "not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder." (*Id.* at pp. 200–201.) Regardless, the duty to instruct is the same, and a trial court need only instruct on either when there is substantial evidence to support it. (See *People v. Simon* (2016) 1 Cal.5th 98, 132; *People v. Boyer* (2006) 38 Cal.4th 412, 469; *In re Christian S.*, *supra*, 7 Cal.4th at p. 783; *People v. Aris* (1989) 215 Cal.App.3d 1178, 1192.)

*supra*, 12 Cal.4th at p. 201, fn. omitted; see also *In re Christian S.* (1994) 7 Cal.4th 768, 783.) "Substantial evidence is … evidence that a reasonable jury could find persuasive." (*People v. Barton*, at p. 201, fn. 8.)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.) "In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).)

## I. The Trial Court Did Not Err in Refusing Instructions on Self-Defense or Imperfect Self-Defense

Defendant argues the trial court failed to give requested instructions on principles of self-defense and imperfect self-defense. However, there simply was no evidence from which a reasonable jury could find either a self-defense or imperfect self-defense argument persuasive. Therefore, the trial court appropriately refused these proposed instructions.

Both self-defense and imperfect self-defense are theories of defense in a homicide case which require the defendant to have been in fear of imminent great bodily injury or death. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048–1049; *In re Christian S.*, *supra*, 7 Cal.4th at p. 771.) "The sole difference between true self-defense and 'unreasonable self-defense' is that the former applies only when the defendant acts in response to circumstances that cause the defendant to fear, and would lead *a reasonable person* to fear, the imminent infliction of death or great bodily injury (§§ 197, 198); unreasonable self-defense, on the other hand, does not require the defendant's fear to be reasonable." (*People v. Barton*, *supra*, 12 Cal.4th at pp. 199–200, quoting *In re Christian S.*, *supra*, 7 Cal.4th at p. 773.) Regardless of reasonableness, the defendant must show they

7.

actually experienced a subjective fear of *imminent* great bodily injury or death. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 72–73.) " 'A bare fear is not enough; "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." ' " (*People v. Trevino* (1988) 200 Cal.App.3d 874, 878–879; see also § 198; CALCRIM 505.) "The danger must be imminent; mere fear that it will become imminent is not enough." (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305; see also CALCRIM 505.)

As this court has noted previously, the relevant law is settled. "For either perfect or imperfect self-defense, the defendant's fear must be of imminent harm." (*People v. Lopez*, *supra*, 199 Cal.App.4th at p. 1305.) " 'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' " (*Id.* at pp. 1305–1306.)

In this case, there simply was no evidence which a reasonable jury could find persuasive to believe there was an imminent danger to defendant. The defense presented no witnesses who could provide direct or circumstantial evidence of defendant's state of mind and beliefs during these encounters. Instead, defendant relied entirely on circumstantial evidence from the prosecution's case in chief to argue he was actually afraid of imminent bodily injury, which precipitated his shooting of the victims. The evidence in this case showed that, when the victims arrived at defendant's house and asked him to stop driving so recklessly through their neighborhood, he responded in an immediately hostile manner, by yelling and cursing at the victims. The two sides engaged in an animated, verbal altercation, which included mutual challenges to fight from both sides. While the video contains no audio, defendant's body posture and hand motions during this argument were aggressive, not fearful. Despite the clearly emotional exchange, there is no evidence that any of the victims attempted to actually engage in any physical altercation, displayed any weapons, threatened to use weapons of any kind, or

8.

tried to walk through the gate in the fence separating them, which was hanging open only a few feet away. After a short while of this verbal exchange, the victims left.

The shooting happened almost a half hour later. Defendant had, in the meantime, armed himself with an assault rifle, which he took with him in his car as he left to repeat his behavior of driving recklessly and at high rates of speed through the neighborhood. After another brief trip, he returned home, where he sat outside of his house with the rifle. The undisputed evidence, including video evidence, shows the victims' car pulled up next to defendant's car for a matter of seconds, during which time Cesar slashed defendant's tires. There was no evidence of any exchange or interaction between the victims and defendant this time, although it appears defendant saw the victims do something to his car. The victims then immediately drove away but were forced to turn around and drive back past defendant's house. Defendant would have known the victims were required to turn around, as they could not exit his dead-end street any other way. The surveillance videos depict defendant acting aggressively, by walking up to the fence with his rifle and firing as the victims' car speeds past and continuing to walk around outside of his house thereafter.

The defense presented no witnesses who could provide direct or circumstantial evidence of defendant's state of mind and beliefs during these encounters. Instead, defendant relied entirely on circumstantial evidence from the prosecution's case in chief to argue he was actually afraid of imminent bodily injury, which precipitated his shooting of the victims. However, nothing about the evidence presented by the prosecution suggested defendant was, in fact, in fear of imminent bodily injury or death. The evidence consistently depicted defendant as aggressive and hostile, from his very first interaction with victims. The verbal altercation with the victims, which can be seen but not heard on the video evidence in this case, does not support a conclusion that defendant was afraid, but rather that he was angry, hostile, and aggressive. Further, there was a significant cooling off period between this verbal altercation and the shooting. The

cooling off period only ended because defendant, having armed himself, resumed engaging in the exact same behavior that had initiated the verbal conflict in the first place: namely, speeding and driving recklessly around the neighborhood. None of this indicates defendant was afraid of the victims.

When the victims again arrived back at his house, there is no evidence of any threat to defendant, nor even any engagement with him. The victims slashed the tires on defendant's vehicle and immediately left, within a matter of seconds. There was no evidence of threats being exchanged or weapons being displayed. In fact, there was no evidence of any interaction at all. This too does not bolster defendant's claim that he was afraid of imminent bodily injury or death. Nor does his behavior after the victims slashed his tires. There is no evidence defendant attempted to seek shelter or engaged in any other behavior suggesting he was afraid, rather than aggressive. Defendant did not attempt go inside of or behind his house. He did not hide. In fact, the evidence shows defendant advanced toward the road and fired his weapon at the victims' car. This is despite there being no evidence from which defendant could conclude the victims had a firearm or any other weapon capable of harming him from a distance as they drove back past his house. There was no evidence that he had seen them brandish a firearm, and there was no evidence they threatened to use a gun, told defendant they had a gun, or even hinted that they would harm him with a weapon. Further, as the trial court observed, defendant had lived on that street for more than a year, and thus knew the victims would be turning around to drive past his house again, as there was no other way out of the street.

In sum, the evidence does not provide a sufficient factual basis to conclude defendant was, in fact, afraid of an imminent danger of great bodily injury or death. Absent this, there was no cause for the jury to decide whether that fear, or the amount of force used in response to it, was reasonable. The trial court did not err in refusing the self-defense instructions.

***Even Assuming a Self-Defense Instruction Could Have Been Appropriately Given, Any Error was Harmless***

Even if we assumed error in failing to instruct here, any error was harmless. It is well-established that errors in instructing the jury are susceptible to harmless error review. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 327; *People v. Peau* (2015) 236 Cal.App.4th 823, 829.) This is also true for errors predicated on federal due process violations, not merely those predicated on errors of state law. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278–279 (*Sullivan*); *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Even assuming there was an instructional error of such sufficient magnitude to conclude a violation of federal due process occurred, reversal is generally not automatic.**[5]** (*Sullivan*, *supra*, 508 U.S. at p. 279 [noting "most constitutional errors have been held amenable to harmless-error analysis"].) Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman*, *supra*, 386 U.S. at p. 24.) The question "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." (*Sullivan*, at p. 279.) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Ibid.*)

Even if the jury had been instructed on self-defense and imperfect self-defense, we find beyond a reasonable doubt this jury would have convicted defendant of first degree murder. Notably, the jury was still given the option of convicting defendant of the lesser-included offenses of second degree murder and voluntary manslaughter. This is because

---

**[5]** There are a few types of error, commonly referred to as "structural error," for which harmless-error review does not exist. (See, e.g., *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310 [explaining structural error exists where "[t]he entire conduct of the trial from beginning to end is obviously affected," such as where a criminal defendant is wholly denied counsel, or the trial precedes before a biased judge].) Defendant does not contend structural error occurred here.

the trial court *did* give instructions on provocation and heat of passion, which advised the jury these different defenses would warrant rejecting first degree murder and instead finding defendant guilty of second degree murder or voluntary manslaughter.[6] There was far more evidence from which a jury could conclude defendant acted in the heat of passion: there was video evidence depicting a heated verbal exchange between defendant and the victims, and video evidence and testimony admitting the victims slashed the tires on defendant's car. However, the jury rejected these arguments, and convicted defendant of first degree murder. There is no reason to believe this jury would have found persuasive a self-defense argument, of which there was no evidence, when it also rejected a heat of passion argument, for which there was significant evidence.

We are satisfied beyond a reasonable doubt that, even if error existed in failing to instruct the jury in relation to self-defense, it was harmless.

## II. Any Claim that the Trial Court Erred by Using the Pattern Criminal Instructions is Forfeited, and Even if Considered, is Without Merit

Defendant also asserts the instructions on provocation failed to appropriately instruct the jury, because there were actually two different standards of provocation at play: the provocation necessary to reduce first degree murder to second degree murder, which is a subjective analysis, and the provocation necessary to reduce murder to voluntary manslaughter, which is an objective analysis. We conclude this issue has been forfeited by defendant's failure to object and is without merit in any case.

### *This Argument is Forfeited by Defendant's Failure to Object*

Defendant acknowledges he did not object to the instructions on provocation given at trial and seemingly concedes that, typically, this would forfeit any claim on appeal. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was

---

[6] Similar instructions were given on the attempted murder counts, instructing the jury it could find defendant guilty of attempted voluntary manslaughter if the crime occurred in the heat of passion.

12.

too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].) However, defendant argues no objection was required, because the jury instructions contain a misstatement of law, which violates due process and requires no objection to preserve it for appellate review. (*Id.* at p. 1012 ["But that rule does not apply when … the trial court gives an instruction that is an incorrect statement of the law"].)

The problem with defendant's argument is the trial court did not give an instruction that was an incorrect statement of the law. We briefly summarize the applicable law. Murder is an unlawful killing with malice aforethought. (§ 187, subd. (a).) First degree murder is murder, plus one of several statutory aggravating factors, including a "willful, deliberate, and premeditated killing," as applicable to this case. (§ 189, subd. (a).) "All other kinds of murders are of the second degree." (§ 189, subd. (b).) Malice may be express or implied. (§ 188; *People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Premeditation and deliberation may be negated by the heat of passion arising from provocation, and this type of provocation may be used as a defense to a claim that a murder is of the first degree, rather than the second. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332.) If the provocation would not cause an average, reasonable person to "experience deadly passion," but the jury is convinced it did, in fact, preclude the defendant from subjectively deliberating or premeditating, the defendant is guilty of second degree murder. (*Ibid.*) If the jury determines the provocation is sufficient to cause a reasonable person to react with deadly passion, the crime is appropriately reduced to voluntary manslaughter. (*Ibid.*)

The trial court here appropriately instructed the jury using the Judicial Council of California's pattern instructions for murder (CALCRIM No. 520); first degree murder (CALCRIM No. 521); provocation's effect on the degree of murder (CALCRIM No. 522); and a heat of passion argument's reduction of murder to voluntary manslaughter as a lesser included offense (CALCRIM No. 570). The jury was told that,

13.

to be guilty of murder, the defendant must have "caused the death of another person" – an issue never in dispute – and acted with malice aforethought.  Further, the instructions advised the jury that, even if it found the defendant committed murder, it is murder "of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in [CALCRIM] Instruction 521."  CALCRIM No. 521 confirmed to the jury the defendant would only be guilty of first degree murder if the jury found the People "have proved that he acted willfully, deliberately, and with premeditation."  While the length of time alone does not dictate whether a killing is premeditated and deliberate, the instructions advised, "a decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

Next, the jury was told that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide."  The jury was also instructed to consider provocation in relation to both whether the crime was first or second degree murder, and whether the defendant committed murder or manslaughter.  Finally, the instructions provided that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion."  This required that the defendant was provoked, and as a result of the provocation, "the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment," and the provocation "would have caused a person of average disposition to act rashly and without due deliberation."

Each of these instructions is a correct statement of law.  Indeed, defendant does not assert otherwise.  His argument is not that any particular instruction was incorrect, but rather the overall effect of the combination of certain instructions – each correct unto themselves – was to create an impression the same standard of provocation applied to both the distinction between first and second degree murder, and between murder and manslaughter.  Therefore, he points to no instruction that was actually an incorrect

14.

statement of law. Rather, defendant complains the trial court should have given additional or supplementary clarifying language to further delineate the distinction between the two. Since there was no incorrect statement of law, and what defendant actually complains of is the failure to give a clarifying instruction, he had an obligation to request such an instruction. (*People v. Hudson*, *supra*, 38 Cal.4th at pp. 1011–1012; see also *People v. Simon*, *supra*, 1 Cal.5th at p. 143; *People v. Gastelum* (2020) 45 Cal.App.5th 757, 770–771.) Having failed to do so, the claim is forfeited.

Further, because there was no incorrect statement of law, defendant's claim also lacks merit. Defendant argues the court specifically defined the term "provocation" to mean only objectively reasonable provocation, and therefore necessarily excluded subjective provocation. Defendant misunderstands both the instructions given and the law. The jury was first told that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." The jury was next informed provocation is a relevant consideration for reducing murder from the first degree to the second degree, and from murder to manslaughter. It was only in the instruction discussing the reduction of murder to manslaughter, given *after* the instructions discussing the distinction between first and second degree murder, in which the court advised the provocation necessary to reduce murder to manslaughter must be objectively reasonable. This makes good sense: an objectively reasonable fear is only needed to reduce murder to manslaughter. It is not necessary to reduce first degree murder to second degree murder. If the same objective reasonableness standard was required for both the reduction from first to second degree murder, and from murder to manslaughter, there would be no reason to tell the jury that provocation was relevant to both. In that case, there would be no instance in which provocation would not reduce murder to manslaughter. A reasonable jury would understand that distinction, when reading the instructions as a whole, because it would not assume the court was giving redundant or unnecessary instructions. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332.) Therefore,

15.

any reasonable jury would understand that objective reasonableness applied solely to the distinction between murder and manslaughter and was not necessary to differentiate degrees of murder.

Indeed, the court in *Hernandez* reached essentially the same conclusion. There, the defendant complained CALCRIM No. 522 was "deficient because it fails to instruct the jury that provocation that is insufficient to reduce the crime to manslaughter may nevertheless be sufficient to reduce the crime from first degree to second degree murder." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1335, fn. omitted.) The court concluded there was no reasonable likelihood the jurors failed to understand provocation was relevant to premeditation and deliberation as a means of separating first and second degree murder, and separately relevant as a means of separating murder from manslaughter. (*Ibid.*) The jury here was also told separately in the instruction on voluntary manslaughter that, in order to be manslaughter, the provocation must be such that an average person "would have reacted from passion rather than from judgment." A reasonable jury would have understood this requirement to apply *only* to a reduction of murder to manslaughter, and not to whether the crime should be reduced from first to second degree murder, since such an instruction was *not* given in relation to the distinction between different degrees of murder.

Defendant argues the *Hernandez* court did not consider precisely the same issue, because it did not consider the relationship between CALCRIM No. 522 and CALCRIM No. 570. It appears to us there is no significant difference between what the *Hernandez* court considered, and the question now posed here. The appellant in *Hernandez* specifically "assert[ed] that CALCRIM No. 522 is deficient because it fails to instruct the jury that provocation that is insufficient to reduce the crime to manslaughter may nevertheless be sufficient to reduce the crime from first degree to second degree murder." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1335, fn. omitted.) *Hernandez* specifically rejected this. (*Ibid.*) That is appellant's argument here, as well, phrased only slightly

16.

differently: that different standards of provocation apply to the reduction between first and second degree murder, and between murder and manslaughter, and the jury instructions do not sufficiently elicit the difference, which may have resulted in jury confusion. However, even if *Hernandez* was distinguishable, "[w]e consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*Id.* at p. 1332.) A reasonable jury would not have been confused by the jury instructions given in this case, for the reasons described above.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.