Filed 4/2/26  P. v. Merida-Diaz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064566 |
| v. | (Super. Ct. No. 21ZF0001) |
| ERIK OYANTAL MERIDA-DIAZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General,

A. Natasha Cortina and Liz Olukoya, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

Erik Merida-Diaz was convicted of the second degree murder of his wife, Elvira Ventura, following a jury trial. On appeal, he argues he killed Ventura while in the heat of passion and, thus, the evidence was insufficient to convict him of second degree murder. He contends the evidence established he was only guilty of voluntary manslaughter. He also argues the trial court erred in introducing a crime scene photograph of the victim.

We disagree as to both arguments. There was substantial evidence that Merida-Diaz did not kill Ventura in a heat of passion. The type of argument that culminated in Ventura's death was commonplace for their relationship and Merida-Diaz told police he only killed her "to shut her up." We also conclude the trial court did not abuse its discretion in admitting the photograph. Although certainly unpleasant, it was not so inflammatory that the jury would have used it to punish Merida-Diaz.

We accordingly affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

Merida-Diaz and Ventura lived in an apartment with their two children. In 2016, they rented out a room to C.H. and his wife, B.H. Around May 2017, C.H. started noticing Merida-Diaz and Ventura having problems. He often heard them arguing about infidelity issues. Both C.H. and B.H. were present for one such incident in May 2017 in which Merida-Diaz found provocative photos on Ventura's phone that were meant for another man. Merida-Diaz slammed the phone on the ground and broke it.

B.H. testified that Merida-Diaz was hysterical after looking at Ventura's phone. Merida-Diaz called Ventura a "whore" and a "bitch." He

2

then took Ventura's clothes, cut them with scissors, and said, "she didn't deserve anything because she was a whore." He also smashed or broke all their wedding photos and grabbed a photo album and tore up all the photos. Ventura hit Merida-Diaz on the arm. They then started pushing each other.

In another incident later the same month, B.H. heard "hitting on the walls" of Merida-Diaz and Ventura's bedroom one night. The next morning, Ventura was acting "very nervous and crying," and she had a bruise on the left side of her face. Merida-Diaz later admitted to C.H. that he had hit Ventura.

Sometime before Merida-Diaz found the photos, B.H. was sitting with Merida-Diaz and Ventura. Ventura asked him, "'if I was unfaithful to you, what would you do to me?'" Merida-Diaz responded that he would "kill her." B.H. testified that Merida-Diaz seemed serious.

On July 5, 2017, C.H. and B.H. left the home and did not return until 1:00 a.m. on the morning of July 6. When they returned, they saw Merida-Diaz walking out of his bedroom in an unusual manner; he was swerving from side to side, and he did not seem okay to them. C.H. said he did not see Ventura at that time.

Around 9:20 that same morning, Merida-Diaz called 911 and confessed to choking Ventura to death. He said it happened at about 5:00 a.m. and claimed he did it because she was cheating on him.

The police interviewed Merida-Diaz that day. The prosecution played an audio recording of the interview for the jury and provided the jury with a transcript of that recording. Merida-Diaz said Ventura cheated on him with another man and he found out through her phone a few days prior to killing her. Ventura and the other man's relationship was only over the phone; it was not sexual, although they would talk about sexual things. The

3

incident culminating in Ventura's death started when Ventura told Merida-Diaz she was going to leave him. They argued and she hit and slapped him. This made him mad. However, he calmed down and suggested they talk more the next day. But she told him she was going to start working so she could leave him, and he would not see his kids. She continued yelling at him and called him an "asshole" and a "motherfucker." He then choked her to "shut her up." He choked her until she stopped breathing. Immediately after killing her, he felt guilt.

Merida-Diaz was charged with first degree murder (Pen. Code, § 187, subd. (a); count 1).[1]

Before his jury trial, the defense moved to exclude a crime scene photograph showing Ventura deceased with a bloody foam coming out of her nose. The photograph depicted Ventura as she appeared in the bedroom when police found her. The defense argued the photograph had no probative value because there was no challenge that Ventura was alive before Merida-Diaz strangled her, nor that she had bloody foam coming out of her nose after her death; the introduction of the photograph would only play on the emotions of the jury. The prosecution argued the photograph was probative of the cause of death because the forensic pathologist was going to testify that the fluid was either from the victim's lungs or blood due to the strangulation.

The trial court admitted the photograph ruling that "[u]nder [section] 352 of the evidence code I'm going to find that the prejudicial effect is outweighed by the probative value. The D.A is alleging that they will be seeking first degree murder, which is premediated, willful, and deliberate. And that would encompass a strong application of force to someone's neck

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.

over a specific period of time. [¶] I would note that the neck area on this photo, as well as the upper chest shows some obvious bruising, which certainly is probative as to what kind of force was applied to the neck, and it may be indicative how long that pressure was applied." The photograph is "relevant to show how the crime occurred, whether there was any malice, and whether there was any premeditation and deliberation. Which may be probative if someone is going to suggest this was an accident where someone is alleging they didn't apply a lot of force and that this was some sort of mistake or accident." The court added, "I really don't see how this will unduly inflame the jury. It looks like a woman who is sleeping with some discharge coming out of the nose." The court further explained that "on a scale of 1 to 10 in terms of being unduly prejudicial this [photograph] would be on the lower side. It actually looks as though the victim is sleeping. There are no open head wounds. There is no blood. There are no bones sticking out. There's no organs sticking out." The court did not think the photo would unduly prejudice the jury because "[b]asically we have a picture of a woman whose eyes are closed and her mouth is closed, and there appears to be maybe some discharge from the nose."

At trial, a forensic pathologist testified that Ventura died from asphyxia due to compression of the neck. The pathologist noted that Ventura had white froth and bloody fluid coming from her mouth, due to increased fluid in the lungs, which is called pulmonary edema. Pulmonary edema is not necessarily diagnostic of asphyxia, but it does happen when someone dies of asphyxia. Merida-Diaz's attorney did not renew the objection to exclude the photograph.

The pathologist explained that Merida-Diaz would have needed to choke Ventura for "more than 2 minutes" for her to become unconscious,

5

and that he would have needed to continue applying pressure on her neck "for 3 [to] 4 minutes more" before she would have died.

The trial court instructed the jury on first and second degree murder with malice aforethought, as well as the lesser included offense of voluntary manslaughter as the result of a sudden quarrel or heat of passion. The jury found Merida-Diaz not guilty of first degree murder but guilty of second degree murder. (§ 187, subd. (a).) The trial court sentenced him to 15 years to life in prison.

Merida-Diaz timely filed a notice of appeal.

DISCUSSION

I.

THERE WAS SUBSTANTIAL EVIDENCE MERIDA-DIAZ DID NOT KILL VENTURA IN THE HEAT OF PASSION

Merida-Diaz does not challenge the jury's finding that he killed Ventura. He argues that the evidence does not support the finding that he acted with malice when he did so. He contends the evidence only shows he was guilty of voluntary manslaughter. We disagree.

Murder is the unlawful killing of another with malice aforethought. (§ 187, subd. (a).) Murder is either of the first or second degree. It is of the first degree if it was committed willfully, deliberately, and with premeditation. (§ 189, subd. (a).) All other murders are of the second degree. (*Id.*, subd. (b).)

The malice necessary for murder can either be express or implied. (§ 188, subd. (a).) Express malice requires "a deliberate intention unlawfully to take away the life of a fellow creature." (*Id.*, subd. (a)(1).) Malice is implied "when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).)

6

""Generally, the intent to unlawfully kill constitutes malice. [Citations.]"" (*People v. Moye* (2009) 47 Cal.4th 537, 549.) But the Legislature has determined that a defendant who kills, even intentionally so, while in the "heat of passion" lacks malice. (§ 192, subd. (a).) Thus, even if the defendant has formed an intent to kill, there is no malice if the intent was formed while in a "heat of passion." (*People v. Peau* (2015) 236 Cal.App.4th 823, 829 (*Peau*).) In that case, the defendant is only guilty of voluntary manslaughter. (*Ibid.*)

A person acts in the heat of passion when they act "'without reflection in response to adequate provocation.'" (*Peau, supra,* 236 Cal.App.4th at p. 829.) The provocation must be caused by the victim and "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583–584 (*Manriquez*).)

Heat of passion has both a subjective and an objective component. (*Manriquez, supra,* 37 Cal.4th at p. 584.) The circumstances which caused the defendant to subjectively act in the heat of passion must also have caused an ordinarily reasonable person to have acted similarly under those circumstances. (*Ibid.*)

In reviewing Merida-Diaz's claim, our inquiry "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt . . . .'" (*Id.* at pp. 1055–1056.) We resolve neither credibility issues nor conflicts in the evidence; that is solely the province of the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

7

Here, there was substantial evidence Merida-Diaz did not subjectively act in the heat of passion. The evidence showed he previously reflected on the precise circumstances of the crime. B.H. testified that Ventura had asked Merida-Diaz what he would do to her if she were ever unfaithful to him. In a serious tone, he stated he would kill her. Thus, in July 2017, when Merida-Diaz found out Ventura had been cheating on him, it was not a situation he had never contemplated before—to the contrary, he had a preconceived response in mind and acted consistently with it. (*People v. Vargas* (2020) 9 Cal.5th 793, 828 [heat of passion requires "an unconsidered reaction to provocation"].)

Moreover, the argument leading to the crime was similar to arguments Merida-Diaz and Ventura had before. C.H. testified he often heard them arguing about issues of infidelity, and the evidence showed these arguments often got heated and physical. From this, the jury could reasonably conclude that the July 2017 argument was "the norm" and not a unique situation Merida-Diaz had never encountered before. (*People v. Cole* (2004) 33 Cal.4th 1158, 1216 [no heat of passion where "conduct that evening . . . was no different than on the many other occasions on which they had argued"].)

On the night of the murder, although Ventura told him she was going to leave him and she hit him in the mouth, Merida-Diaz admitted to police that he was able to "calm down." He suggested to Ventura that they talk more the following day. (*Manriquez, supra*, 37 Cal.4th at p. 585 [no heat of passion where the defendant was "attempting to exert a calming influence on the victim"].) However, Ventura continued to verbally insult him, so he choked her "to shut her up." The evidence does not establish Ventura's actions were "sufficiently provocative that [they] would cause an ordinary

8

person of average disposition to act rashly or without due deliberation and reflection" (*Manriquez,* at pp. 583–584), nor do they support a finding Merida-Diaz acted "'without reflection in response to adequate provocation'" (*Peau, supra*, 236 Cal.App.4th at p. 829).

As to the objective component, there was substantial evidence that these circumstances would not have aroused a heat of passion in an objectively reasonable person. A reasonable person would not stop an argument by choking the other person involved. (*Manriquez, supra*, 37 Cal.4th at p. 586 [victim's insults and repeated assertions that the defendant should take out and use weapon was insufficient to cause a reasonable person to lose sight of reason and judgment].)

Accordingly, there was substantial evidence Merida-Diaz committed second degree murder in the killing of Ventura; the evidence did not support a finding Merida-Diaz killed Ventura while in the heat of passion.

II.

THE TRIAL COURT DID NOT ERR IN ADMITTING THE CRIME SCENE PHOTOGRAPH OF THE VICTIM

Merida-Diaz argues the crime scene photograph depicting Ventura was not relevant and that its admission was a violation of state and federal due process. He contends that, although the prosecution told the court that the bloody foam was due to the strangulation, the pathologist testified the substance was not diagnostic of strangulation. We conclude the trial court did not abuse its discretion in admitting the photograph.

Trial courts are often tasked with ruling on the admission of gruesome photographs at homicide trials. (*People v. Suarez* (2020) 10 Cal.5th

9

116, 173 (*Suarez*).) Like any other evidence, the trial court has broad discretion in determining the relevance of a crime scene photograph. (*Ibid.*)

The California Supreme Court has held that crime scene photographs of a deceased victim are relevant to show that the murder occurred, how the murder occurred, and where the murder occurred. (See *Suarez, supra*, 10 Cal.5th at p. 173.) Such photographs "clarify testimony regarding the [victim's] injuries and causes of death." (*Ibid.*) Further, prosecutors ""are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the [victim's body] to determine if the evidence supports the prosecution's theory of the case. [Citations.]"" (*People v. Powell* (2018) 6 Cal.5th 136, 164.)

Here, the trial court did not err in finding the photograph was relevant. It tended to prove that Ventura's death was the result of murder, not voluntary manslaughter, and that Merida-Diaz strangled Ventura. Although the bloody foam did not conclusively establish that the death occurred by strangulation, it was consistent with such a cause. The photograph was relevant to support the prosecution's theory that Merida-Diaz murdered Ventura. That Merida-Diaz "did not contest the testimony of the medical examiner . . . did not render the photograph[] irrelevant; rather, the [photo] served to clarify that testimony." (*People v. Crittenden* (1994) 9 Cal.4th 83, 132 (*Crittenden*).)

Relevant evidence is inadmissible if its prejudicial effect substantially outweighs its probative value. (Evid. Code, § 352.) This determination is also within the trial court's discretion. (*Suarez, supra*, 10 Cal.5th at p. 173.) Evidence is prejudicial if it is substantially likely that the evidence would inflame the passions of the jury such that they would use

it to punish the defendant, as opposed to using it for a lawful evidentiary purpose. (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

In evaluating prejudice in a homicide case, the California Supreme Court has explained that "victim photographs and other graphic items of evidence . . . always are disturbing." (*Crittenden, supra*, 9 Cal.4th at p. 134.) The photograph of the victim in this case is disturbing. However, it is not so unduly shocking or inflammatory that the jury would use it to punish the defendant. The trial court provided a reasoned explanation for why it exercised its discretion in the way it did, and we take no issue with it.

Even if the trial court did abuse its discretion, there was no prejudice. Merida-Diaz contends we should review such an error under the *Chapman v. California* (1967) 386 U.S. 18 beyond a reasonable doubt standard because the error deprived him of a fair trial. (See *Chapman*, at p. 24.) His lone statement on the point is that the "error affected the sole disputed issue—whether [he] acted with malice or in the heat of passion." He does not cite to anywhere in the record to support this contention. In any event, we are not persuaded. Merida-Diaz cannot "'inflate garden-variety evidentiary questions into constitutional ones.'" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right[s]." (*Ibid.*) Merida-Diaz does not claim the admission of the photograph precluded him from presenting a defense, and we would not reach such a conclusion.

Instead, we review evidentiary errors to determine if it is "reasonably probable [that the] defendant would have achieved a more favorable result absent the exclusion of [the evidence]." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.)

11

As explained *ante*, there was more than enough evidence of Merida-Diaz's guilt of the crime of murder, rather than voluntary manslaughter. The record amply demonstrates Merida-Diaz strangled Ventura to death for a period of at least five minutes because he wanted "to shut her up." It was not reasonably probable that the exclusion of a photograph depicting the deceased victim would have resulted in a more favorable outcome for Merida-Diaz.[2]

---

[2] In passing, Merida-Diaz contends his counsel should have renewed the objection after the forensic pathologist testified that the bloody foam was not diagnostic of asphyxia. This argument was not properly raised under its own heading. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Even if we were to address the argument, it would not affect our conclusion. Assuming Merida-Diaz's counsel was ineffective for failing to renew the objection, it would not have prejudiced him. Prejudice under this standard means "there [was] a reasonable probability that [Merida-Diaz] would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) As explained *ante*, there was ample evidence, aside from the photograph, demonstrating Merida-Diaz's guilt.

## DISPOSITION

The judgment is affirmed.


BANCROFT, J.*

WE CONCUR:


MOORE, ACTING P. J.


DELANEY, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.